UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| D. CLARK HOWELL | : |
| VS. | :     NO. 3:02CV736(JBA) |
| NEW HAVEN BOARD OF EDUCATION : | MARCH 26, 2005 |

### BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW, REMITTITUR, OR NEW TRIAL

*<u>Legal Standard</u>*

"A court may render judgment as a matter of law when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.' Fed.R.Civ.P. 50(a). In reviewing the evidence in the record, 'the court must draw all reasonable inferences in favor of the nonmoving party[;]...it may not make credibility determinations or weigh the evidence...[and must] disregard all evidence favorable to the moving party that the jury is not required to believe." <u>Raniola v. Bratton</u>, 243 F.3d 610, 616-17 (2d Cir. 2001), *quoting* <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 120 S.Ct. 2097, 2110 (2000).

"In ruling on a motion for judgment as a matter of law under Fed.R.Civ.P. 50(b), a district court must consider the evidence in the light most favorable to

1

the non-movant, giving that party the benefit of all reasonable, favorable inferences the jury might have drawn from the evidence....The trial court is not to consider the credibility of the witnesses or otherwise assess the weight of conflicting evidence, since that function is given to the jury....Only when no evidence exists to support the jury's verdict and the verdict it reached could have been based on nothing more than surmise and conjecture or where there is such overwhelming evidence in favor of the movant that reasonable and fair-minded jurors could not arrive at a verdict against the movant, may a trial court properly grant a motion to set aside a jury verdict....The same standard governs appellate review of the grant of such judgment." Jones v. Spentonbush-Red Star Co, 155 F.3d 587 (2d Cir. 1998) (citations omitted).

"In evaluating a motion under this provision, a trial court 'cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury.' Weldy v. Piedmont Airlines, Inc., 985 F.2d 57, 60 (2d Cir. 1993). In other words, 'either there must be such a complete absence of evidence supporting the verdict that the jury's finding could only have been the result o[f] sheer surmise and conjecture or the evidence must be so overwhelming that reasonable and fair-minded persons could only have reached the opposite result.'" Hardy v. Saliva Diagnostic Systems, Inc., 52 F. Supp. 2d 333, 337 (D. Conn. 1999), citing Concerned Residents for Envirn. v. Southview

Farm, 34 F.3d 114, 117 (2d Cir. 1994); Stubbs v. Dudley, 849 F.2d 83, 85 (2d Cir. 1988).

"Judgment as a matter of law may not properly be granted under Rule 50 unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in her favor. In deciding such a motion, the court must give deference to all credibility determinations and reasonable inferences of the jury, and it may not itself weigh the credibility of witnesses or consider the weight of the evidence. Thus, judgment as a matter of law should not be granted unless (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it." Galdieri-Ambrosini v. National Realty & Dev. Corp., 136 F.3d 276, 289 (2d Cir. 1998). Quoted in National Communications Association, Inc. v. AT&T Corp., 238 F.3d 124, 127 (2d Cir. 2001).

Although a motion for a new trial under Rule 59 may be granted, even in the presence of sufficient evidence supporting the verdict, if the court feels that the jury "has reached a seriously erroneous result or...the verdict is a miscarriage of justice," Song v. Ives Labs., Inc., 957 F.2d 1041, 1047 (2d Cir. 1992), the

court "must bear in mind...that such a motion should only be granted when the jury's verdict is 'egregious.'" Schanzer v. United Technologies Corp., 120 F. Supp. 2d 200, 208 (D. Conn. 2000) (Arterton, J.), quoting Dunlap-McCullr v. Riese Organization, 980 F.2d 153, 158 (2d Cir. 1992).

### *There Was Sufficient Evidence To Support The Jury's Conclusion That The Plaintiff Was Perceived To be Mentally Disabled From The Broad Class Of Teaching Jobs And That The Stated Reason For The Actions Taken Against Him Was A Pretext For Unlawful Discrimination*

It is unavoidably characteristic of post-judgment motions that they tend toward the error of characterizing the evidence in the light *least* favorable to the verdict rather than, as they should, in the light *most* favorable to that verdict. It is the product of an advocate's mind-set, and it is a vice shared by the defendant's brief in this case. Contrary to the defendant's claim, the jury in this case heard evidence from which it could justifiably conclude, as it did, that Mr. Russell perceived the plaintiff as being mentally ill, that he ridiculed him for it, that he harbored a prejudice against people with psychiatric disorders, that he did not believe such people were suitable for teaching at all, and that his stated reasons for bringing misconduct charges against the plaintiff, like the charges themselves, were false and fabricated. The jury also had sufficient evidence to conclude that Superintendent Mayo acted as a joint tortfeasor with Russell.

4

The plaintiff had enjoyed an excellent relationship with Mr. Russell, his principal at Hyde Leadership School, until he began suffering from a combination of worsening adult-onset diabetes and severe depression. (Exhibit A,[1] pp. 186-88) He entered psychotherapy with Dr. Terry Eicher, a psychologist, and Dr. Robert Ostroff, a psychiatrist. (Id., pp. 189-92) During a period in which his symptoms had worsened, and he was occasionally late arriving at school as a result, he was questioned by the Assistant Principal, Al Grenet. (Id., p. 194) He informed Mr. Grenet that he thought he might need to change his medications "because I take Zoloft, and maybe I need to up the dosage....I see a psychologist and I'm going to go check that out." (Id., p. 195) He went on to explain his psychological fears and related symptoms. (Ibid.) He explained that he suffered from depression and that he thought there might be a relationship between his depression and the diabetes from which he also suffered. (Id., p. 196)

Shortly after that conversation, he noticed a dramatic change in the treatment he received from Principal Russell. (Id., pp. 196-97) "Within a couple of weeks...he would call me down to the office and ask me questions about things that happened two years ago, or...instead of coming down to see me in

---

[1] The trial transcript is in six volumes which were prepared at different times and are separately paginated. Accordingly, each volume's excerpts has been designated as a separate exhibit, all of which are submitted herewith.

my room, he would send a memo...." Routine paperwork from him suddenly had immediate required response dates attached. Routine interactions with faculty and students suddenly became the cause for harsh criticism and threats of discipline. (Id., pp. 201-02) "He was very supportive until the Alan Grenet conversation where I slowly realized it's completely the other way around. Every single time there is an opportunity, he's coming at me like I'm doing something different, or 'bizarre' was his words, 'that's bizarre.'" (Id., pp. 207-08)[2] Hyde was a school where physical interaction between faculty and students was allowed, yet when the plaintiff literally touched lightly the arm of a student, Russell accused him of committing an assault. (Id., pp. 216-18, 220) When he took a box of cookies to one of his students during a class with another teacher, as a class prize, Russell confronted him about it and called the incident "bizarre." (Id., pp. 220-21) Russell stated on that occasion: "Al Grenet told me about your problems with your medication and I'm just concerned. I'm doing this out of concern, but you are acting very bizarre." (Id., p. 223) Russell, on another occasion, said to the plaintiff: "This is your problem, and ever since Al Grenet

---

[2] Russell also used the word "bizarre" repeatedly in the paper trail he created in his effort to terminate the plaintiff's employment. (Exhibit B, pp. 82, 102-04)

told me what you said, I can't trust where you are coming from...." (Exhibit B, p. 40)[3]

The evidence showed that Russell had a history of discriminating against teachers who were receiving psychiatric treatment. Jeanne Lovrin had been an art teacher at Hyde. When Russell learned from the plaintiff that she suffered from depression and was receiving medication, his immediate reaction was to state: "Yeah, so who knows what that medication might be making her say. Who knows what." (Exhibit A, pp. 197-201)[4] He verbally abused her so badly that he reduced her to tears and she left the New Haven school system for a school in Hamden. (Ibid.) After the plaintiff had been removed from Hyde School, Russell on more than one occasion instructed the school staff "to have nothing to do with him" and "alluded to the fact that he wasn't right and that he was crazy." (Exhibit C, p. 35[5]) He said the same things about Jeanne Lovrin after she had been forced out of the school. (Id., pp. 35-36)

---

[3] Two months later, in early April, the plaintiff told Russell directly that he was receiving psychotherapy. (Exhibit B, pp. 133-35)

[4] He made a similar statement about the plaintiff in January, 2000, stating that he did not know what effect the plaintiff's medication may be having. (Exhibit F, p. 94)

[5] Testimony of Zelphia Hunter.

The defendant's stated reasons for suspending the plaintiff from all teaching duties, and thereafter transferring him to a lower-paying position, were shown to be false. Those stated reasons were chiefly (a) the plaintiff having stated to a school assembly that he enjoyed spending time with the wife of another teacher – an attempt at humor for which he immediately apologized both to the assembly and privately to the fellow teacher; and (b) the false claim that he had criticized a student's lack of diligence by saying that the student should not "blow off" the project "like Jarel did to Jamal" - referring to a widely-discussed sexual encounter between two students on a school trip.[6] The defendant's witnesses expressed horror at these two allegations and, after the plaintiff was involuntarily transferred to a lower-paying position, Superintendent Mayo asserted that he would terminate his employment if there were a repetition. (Exhibit F, pp. 158-59)

There was overwhelming evidence that the defendant's stated reason for its actions was false. The last school event before the assembly at which the plaintiff had made his comment about the other teacher's wife was the school graduation, an event attended not only by all the students but by their families as well. At that ceremony, the personal representative of Superintendent Mayo,

---

[6] In fact, the plaintiff testified that he overheard students discussing the incident and simply told them: "That's enough about Jarel." (Exhibit B, pp. 162-63)

Thelma Johnson, was the speaker. She had been invited by Principal Russell. Both men were on the stage when Ms. Johnson repeatedly shouted at the assembled students, parents and families: "Fuck you! That's right, I'm going to say it again, too, fuck you." (Exhibit B, pp. 30-36)

On another occasion, a student named Cory Jenkins had been suspended for using that word in a school hallway. Principal Russell, in front of several students, said to that student: "I think we're going to bring your mom into school and have you say to her what you said in the hallway. And then we're going to have you do to your momma what you said in the hallway." (Id., pp. 36-37) When Shaniqua Garcia, a female student, complained to Russell about a staff member cursing in front of the students, he took no disciplinary action at all. (Exhibit C, p. 69)

Russell frequently, in conversations with students, referred to the practice of the male students of wearing a long belt looped down in front of their pants as wearing a "wish belt," by which he meant that they wished it was a part of their anatomy. (Exhibit B, pp. 38-39) To the female students, encouraging them to avoid premarital sex, he would remark that they should "shackle up your ankles." (Id., pp. 39-40)

The defendant's claim that discipline of the plaintiff was appropriate for his allegedly having told students not to "blow off" an assignment "like Jarel did to

Jamal" was particularly striking. The incident about which students were gossiping had taken place in a school van bringing the students back from a track event. The teacher who was the chaperone in that van at the time the sexual act took place happened to be the same teacher whose wife was the subject of the plaintiff's comment at the school assembly. His failure to prevent that sexual act from taking place literally under his very eyes did not produce any disciplinary action whatsoever. (Exhibit F, pp. 104-08) In his testimony for the defendant, Principal Russell said he was unable to say whether it was worse for the plaintiff to have mentioned the event in front of students than for the chaperone to allow the event to occur. (Id., p. 108)

    The evidence was more than sufficient to permit the jury to find that Russell had created an artificial "paper trail" for the purpose of attempting to justify disciplinary action against the plaintiff. After his hearing at the defendant's headquarters, the plaintiff for the first time was allowed to see his personnel file.[7] It contained many memoranda from Russell which, contrary to the requirements of the union contract, he had never seen and several of which appeared to have been back-dated. (Exhibit B, pp. 51, 53-61, 66-73; Exhibit F, pp. 69-83, 87-88, 91-93) Russell testified that he himself actively participated in making the

---

[7] Russell had refused the plaintiff's earlier request to see his file. (Exhibit C, pp. 121-22)

decision to suspend the plaintiff from teaching and, later, to transfer him to a lower-paying position.  (Exhibit F, pp. 62-63) Before the decision was made, moreover, he actively lobbied Superintendent Mayo to influence him against the plaintiff.  (Id., pp. 95-97)

    Russell's attempt to conceal his belief that the plaintiff was mentally ill, and this motivated his actions, also was apparent to the jury.  For example, when his own memorandum to the defendant's Director of Personnel, recommending that the plaintiff be referred to the Employee Assistance Program, was introduced into evidence, he claimed that the EAP was not used for mental health issues.  (Exhibit F, p. 93) Superintendent Mayo, however, admitted that it is for precisely that purpose.  (Id., pp. 132-33)

    In preparation for the first of the plaintiff's two disciplinary hearings, Russell, at Mayo's urging, actively solicited letters of complaint from his faculty in an attempt to buttress the paper trail he had created.  (Id., p. 160; Exhibit D, pp. 231-32; Exhibit E, pp. 12-14)

    If the jury believes that the employer's explanation is false, that fact, combined with the prima facie case, is sufficient to permit a jury to find intentional discrimination.  "Proof that the defendant's explanation is unworthy of credence is...one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive....In appropriate circumstances,

the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.  Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'"  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S. Ct. 2097, 108 (2000), quoting Wright v. West, 505 U.S. 277, 296 (1992).  "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.  Thus, rejection of the defendant's proffered reasons will permit...the trier of fact to infer the ultimate fact of intentional discrimination...[and] no additional proof of discrimination is required." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993).  "[O]nly occasionally will a *prima facie* case plus pretext fall short of the burden a plaintiff carries to reach a jury on the ultimate question of discrimination...." Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 94 (2d Cir. 2001).  Like all other aspects of an employment discrimination case, the falsity of the employer's asserted legitimate nondiscriminatory reasons for its actions may be inferred from circumstantial evidence.  See Robertson v. Sikorsky Aircraft Corp., 258 F. Supp. 2d 33 (D. Conn. 2003) (Goettel, J.).

The action taken against the plaintiff was harsh. Before his first hearing even occurred, he was barred from the school. (Exhibit B, p. 50) The two hearings conducted by Superintendent Mayo and Principal Russell were brutal. The plaintiff was given virtually no opportunity to speak. It was obvious to the union president that the Superintendent already had made up his mind before the hearing began. (Exhibit C, p. 43) Mayo shouted at the plaintiff, calling him at various times "man" and "boy," and instructing him not to speak. (Id., pp. 51-52) He was suspended from all teaching duties until he could produce a physician's letter attesting to his mental stability. When he produced such a letter, from his treating psychologist, it was rejected. When he produced a second letter, this one from his psychiatrist, the defendant delayed nearly a month before allowing him to return to teaching – yet, without any stated reasons, forcing him to take a lower-paying position at a different school. The jury would have been justified in concluding that the Principal and Superintendent already had made up their minds that he was unfit to teach and that they resisted evidence to the contrary until it became impossible to do so any longer.

### *The Plaintiff Presented Sufficient Evidence Of Damages And Of His Reasonable Efforts To Mitigate Those Damages*

The evidence showed that a teaching position at Hyde Leadership School carried with it added compensation of from $10,000 to $13,000 annually. (Exhibit A, pp. 136-37; Exhibit C, p. 43) The plaintiff's involuntary transfer out of that school resulted in a 25% pay cut for the remainder of his teaching career. (Exhibit C, p. 60) Most New Haven teachers who obtain tenure, as the plaintiff did, continue teaching until they have completed 35 years because that is when their pension benefits reach their highest point. There is no mandatory retirement age. (Id., pp. 60-61) The reduction in the plaintiff's annual pay caused by the actions of the defendant, however, would affect his pension as well, since pensions are based on the teacher's average salary during his last three years of employment. (Id., p. 61) The life tables, of which the court took judicial notice, showed that the plaintiff would still be alive when he completed his 35th year of teaching. He was 37 years old when he was involuntarily transferred. (Exhibit B, p. 25)

The plaintiff did make reasonable efforts to mitigate his damages. He both sought and located employment in non-New Haven schools. In fact, however, those positions were less desirable because they were non-tenured, the teachers he interviewed all were leaving for unstated reasons, and in one

instance there was no contract at all.  (Id., pp. 180-82, 206-08)  The defendant has the burden of proving that the plaintiff failed to mitigate damages.  *E.g.*, Jones v. Consolidated Rail Corp., 800 F.2d 590, 593 (6th Cir. 1986); Preston v. Keith, 217 Conn. 12, 21, 584 A.2d 439 (1991).  There is no such proof in this case.

With respect to the question of front pay, the court has the discretion to consider the jury's verdict advisory in nature, but it would be reasonable at a minimum to be guided by that verdict, since it is the minimum verdict possible on the evidence in this case.  It assumes that the disparity between Hyde pay and pay in the other New Haven schools will remain numerically the same over time, but in reality the disparity is certain to grow since it is based on hourly wage rates.

When a damages award includes compensation for future losses, the jury is not required to discount that award to its present value.  Passantino v. Johnson & Johnson Consumer Products, Inc., 212 F.3d 493 (9th Cir. 2000). When a jury awards damages that include a component for lost wages, past or future, the court should enhance the jury verdict by adding in a sum to compensate the plaintiff for the heavy tax liability on any lump sum award of that kind.  O'Neill v. Sears, Roebuck and Co., 108 F. Supp. 2d 443 (E.D. Pa. 2000).

15

The jury's award for emotional distress was entirely reasonable. The intense emotional distress suffered by the plaintiff was painfully apparent during his testimony, which at one point had to be interrupted when he began to weep while recounting his forced removal from the school. (Exhibit B, p. 203)[8] Examination of emotional distress awards approved in other comparable employment cases in previous years supports the conclusion that the award in this case is well within the bounds of reasonableness. *E.g.*, Koster v. Trans World Airlines, Inc., 181 F.3d 24 (1st Cir. 1999) (reducing damages for emotional distress in age discrimination case from $716,000 to $250,000); Forsyth v. City of Dallas, 91 F.3d 769 (5th Cir. 1996) (emotional distress awards of $100,000 and $75,000 for transfers of police officers in retaliation for whistle-blowing); Neal v. Honeywell, Inc., 191 F.3d 827 (7th Cir. 1999) ($200,000 for emotional distress associated with employment termination); Opielowski-Brouwer v. Haddam Hills Academy, 31 Conn. L. Rptr. No. 6, 193 (2002) ($260,000 for emotional distress associated with employment termination after 13 days of employment); Tullis v. Townley Engineering & Mfg. Co., Inc., 243 F.3d 1058 (7th Cir. 2001) ($80,000 for emotional distress caused by termination, based entirely on plaintiff's testimony);

---

[8] His final exit was engineered in a particularly cruel way. He was required to remove his belongings after school hours under the eye of a security officer. (Exhibit C, pp. 124-25)

Peeler v. Village of Kingston Mines, 862 F.2d 135 (7th Cir. 1988) ($50,000 compensatory damages for mental anguish resulting from retaliatory discharge of police officer by village mayor); Foster v. Time Watner Entertainment Co., L.P., 250 F.3d 1189 (8th Cir. 2001) ($75,000 for emotional distress caused by employment termination); Passantino v. Johnson & Johnson Consumer Products, Inc., 212 F.3d 493 (9th Cir. 2000) ($1 million for emotional distress related to employment discrimination); Lambert v. Ackerley, 180 F.3d 997 (9th Cir. 1999) ($75,000 for emotional distress related to Fair Labor Standards Act violation); Lewis v. Cowen, 979 F. Supp. 99 (D. Conn. 1997) ($1.02 million compensatory damages in wrongful termination case of which half was for emotional distress).

## CONCLUSION

The defendant's post-trial motion should be denied in all respects.

Respectfully submitted:

_____
JOHN R. WILLIAMS (ct00215)
51 Elm Street
New Haven, CT 06510
(203) 562-9931
FAX: (203) 776-9494
E-Mail: jrw@johnrwilliams.com
Plaintiff's Attorney

CERTIFICATION OF SERVICE

On the date above stated, a copy hereof was mailed to Attorney Audrey C. Kramer, Assistant Corporation Counsel, 165 Church Street, New Haven, cT 06510.

_____
JOHN R. WILLIAMS