gym in the morning, and before we do that, we wait at the door until Mr. Russell is satisfied that every student is quiet and ready and focussed and thinking about class, and then once he's satisfied with that, then we go to class. And so the students were in the gym, and I was there, too. Some of the students were still talking, and John would say, "We're not ready," and some of the students were still talking, and then Cory was one of them, and so he pointed out Cory and he said "Some of us are still talking, and apparently you haven't learned your lesson, Cory."

And Cory looked up like, "I wasn't talking."

And John continued and said, "Yes, you know what I'm talking about, you're the one who said the F word in the hallway."

And Cory is like this (indicating), and he said, "As a matter of fact, I think we're going to bring your mom into school and have you say to her what you said in the hallway."

And Cory is like this (indicating), and then he went on after that and said, "And then we're going to have you do to your momma what you said in the hallway," and all of the students are

1    like -- you know, like (indicating), and so
2    everyone did quiet down and off we went to class,
3    and I remember watching that and being, I guess,
4    there is --
5        Q.    Okay, I'm not interested in your reaction.
6    What it is that you said to Mr. Russell, "How can
7    it be okay that you say something like that in
8    front of the students?" And there were two other
9    things that you said you mentioned to Mr. Russell?
10       A.    Yes.
11       Q.    What were they?
12       A.    The wish belt and shackle up your ankles.
13       Q.    Well, I don't understand what that means,
14   so why don't you tell us.
15       A.    He would tease the guys about their belt
16   hanging down in front. The guys had this fashion
17   thing where they would -- we had a rule you to keep
18   your shirt tucked in. The students hated it and
19   didn't want to do it, so they would try everything,
20   and we would have them tuck in their shirt, and
21   another thing the staff objected to was when guys
22   would have their pants hitched all the way down to
23   they're about to fall off, and they'd also have
24   their belt hanging out in front like an extra
25   length hanging out, and he would say, "You could

1  put your wish belt away," and then he would laugh
2  about it to us with the staff later and explain the
3  wish belt is like you wish that body part was that
4  long where it's hanging like the belt.
5      Q.   So he would say this to the students?
6      A.   Yes.
7      Q.   More than once?
8      A.   It was something that he would say when
9  occasion warranted.  It wouldn't be allowed, but
10 when a kid was doing that.
11     Q.   What was the third thing he said?
12     A.   Shackle up your ankles.  One of the things
13 that breaks your heart when you are teaching, there
14 is a number of students that get pregnant in 9th,
15 10th, 11th, 12th grade while they're in school and
16 they end up having to go to Polly McCabe, the
17 school that works with young pregnant teens, and so
18 then you would not only lose a student, but you
19 knew they were off for a rough road, and during
20 times when the school was assembled, if a
21 particular girl had been in trouble or been accused
22 of being in trouble with a guy, he would call out
23 that, kind of like the Cory Jenkins incident, he
24 would call that out to that student in a way to get
25 to them that I thought was just a little different,

but must be okay if that's what the principal does. He would say, "Yeah, you know, you've got to shackle up your ankles," to that student, you know, trying to get them not to have anymore intercourse with -- or whatever.

Q. So, he would say that in front of other students?

A. Yes.

Q. And so you confronted him with those three things?

A. It's not like I was confronting him. I was just saying I don't understand inappropriate, that word. I don't understand here. I understand a lot. I understand that people could be upset, I understand people could misunderstand, I understand I shouldn't have said it in the first place, but inappropriate I don't think was the word that applies here, or if it does apply, I don't understand.

Q. Did he respond to that?

A. No. He kept on saying, "This is your problem, and ever since Al Grenet told me what you said, I can't trust where you are coming from, and I think you should explain to the whole school where you are coming from on this. That is

```
 1    bizarre.  I can't understand how you could possibly
 2    say what you said to Mr. Sagnella."
 3         Q.   And he used the word "bizarre" again?
 4         A.   Yes.
 5         Q.   That you said was about a week after the
 6    August 30th incident?
 7         A.   Yes.
 8         Q.   And you were telling us yesterday when we
 9    broke how there came a time, and I think you said
10    it was the -- I don't remember the date, there was
11    a time in September when you got a notice that you
12    had a meeting at Dr. Mayo's office?
13         A.   Yes, the Friday before the hearing.  So, if
14    the hearing was on a Monday, I got the letter via
15    certified mail, showed up also certified in the
16    regular mail at my house on Thursday.  I wasn't
17    there to take the certified mail, so I had a notice
18    of certified mail, but I also had the regular mail,
19    and I didn't get to read that until Friday morning
20    when I actually picked up my mail on the way out
21    the door on the way to school.  So, I read it
22    Friday that I needed to be at a hearing with Dr.
23    Mayo on the Monday.
24         Q.   Okay.  And that was one of the letters that
25    came into evidence when President Lucan was
```

1   A.   And said, "You're not to go to school on Monday. Don't go to school on Monday."

3   Q.   And what did you say?

4   A.   I said, "Why".

5   Q.   And what did he say?

6   A.   "We can tell you that at the hearing."

7   Q.   Okay, was there any further discussion?

8   A.   I said, "I work for the city of New Haven and so I'll be there."

   He said, "No, you are not to go to school."

   And again I said, "Why?"

   And he said, "Well, we will be able to tell you that at the hearing." And so I hung up the phone.

16  Q.   And, in fact, were you ever permitted to return to that building again?

18  A.   Just to pick up my stuff with the security guard.

20  Q.   With the security guard watching?

21  A.   Yes. I had to wait until after all of the students were gone. I had to make arrangements to come sometime in the afternoon so no one would be in the building.

25  Q.   Now, you testified after the meeting where

1  Superintendent Mayo ordered you to get the medical
2  certification and not to return to Hyde and told
3  you you were out, you were on leave. You told us
4  that you were then permitted to look at, but not at
5  that point to copy, your central office personnel
6  file?
7      A.   Yes.
8      Q.   And at that time when you examined that
9  file, did you learn for the first time that there
10 were documents in that file generated by Mr.
11 Russell that you had never before seen?
12     A.   Yes.
13     Q.   That gets us back to where we were when we
14 left yesterday. And the item that I was
15 questioning you about at the end of the day was
16 Plaintiff's Exhibit 15 for identification, and this
17 is two pages, and you previously identified the
18 first page as being a memorandum signed by Mr.
19 Russell, and the second page is being a response to
20 that memorandum which you created after you saw it;
21 is that correct?
22     A.   Yes.
23     Q.   And you've testified yesterday that the
24 second page, you then handed it to Starlet Wilder
25 to be added to your personnel file to give your

```
 1   jury?  I'm sorry, your Honor.
 2              THE COURT:  Yes.
 3              MR. WILLIAMS:  May I read this?
 4              THE COURT:  Yes.
 5              MR. WILLIAMS:  Thank you.  Exhibit 15
 6   page one is a memorandum from John Russell to Clark
 7   Howell.  It's dated 2/28/00, but it is file stamped
 8   received at the Board of Education April 13, 2000.
 9   It says that there is a copy to file- Starlet
10   Wilder.
11              "This memo is to document our discussion
12   on 2/7/00, regarding allegations of inappropriate
13   statements made by you on several occasions here at
14   Hyde Leadership School.  In that meeting, you
15   admitted to making the statements and acknowledged
16   that they were inappropriate or could at least be
17   considered to be so.  Your honesty and candor is
18   appreciated, but the statements made by you and
19   addressed in our meeting are totally unacceptable.
20              "As stated in our meeting, you cannot
21   make these inappropriate statements or any like
22   these, and you have been directed to cease from
23   doing so.  Also, in this meeting you were reminded
24   of a previous incident of this nature.  Attached is
25   a copy of that documentation.
```

```
 1            "This documentation of our conversation
 2   and the attached documentation will become part of
 3   your permanent records, and further action may be
 4   taken against you.  I admonish you not to take this
 5   matter lightly and seek whatever assistance that
 6   may be needed to rectify this ongoing problem."
 7            And the attachment from Mr. Howell dated
 8   10/12/00 says "addendum to memo date 2/28/00."
 9            "I was never given a copy of this memo.
10   I was never asked to review and sign it.  The first
11   time I saw it was on September 25, 2000 following a
12   hearing with Dr. Mayo.  This memo refers to no
13   factual incident."
14       Q.   Now, I'm going to show you a Plaintiff's
15   Exhibit 14 for identification.  When was the first
16   time you saw that document?
17       A.   The same day.
18       Q.   Okay.  When you reviewed your personnel
19   file on September 25th?
20       A.   Yes.
21       Q.   And the second page attached to that is
22   what?
23       A.   My response.
24       Q.   Which you gave to Starlet Wilder?
25       A.   Yes.
```

```
 1      Q.   As you had the previous one?
 2      A.   Yes.
 3      Q.   All right, and those are true and accurate
 4  copies of those documents?
 5      A.   Yes.
 6           MR. WILLIAMS: Offer it, your Honor.
 7           MS. KRAMER: I have the same objection,
 8  your Honor.
 9           THE COURT: Meaning you have the same
10  objection to the second page, but not the first
11  page.
12           MS. KRAMER: That's right.
13           THE COURT: All right, again, this is
14  permitted into evidence with a limitation on the
15  purpose of the second page, which is Mr. Howell's
16  response.  This is because the process challenged
17  here leading to his transfer is still underway, and
18  thus it's a part of the undertakings of the
19  parties, but it is the fact of that document, not
20  its contents that is the purpose of the offer.  All
21  right.
22           MR. WILLIAMS: May I read that, your
23  Honor.
24           THE COURT: Yes.
25           MR. WILLIAMS: This is a memorandum to
```

```
 1    Mr. Howell from Mr. Russell on the subject of
 2    inappropriate comments.  It is dated 5/24/99, but
 3    it is file stamped received at the Board of
 4    Education April 13, 2000.  And it says cc to file.
 5              "As you are aware, it was brought to my
 6    attention by a guardian of one of our students that
 7    you made inappropriate comments to students
 8    recently about another student.  When you and I
 9    discussed the matter, you admitted to making the
10    comment and apologized.  After speaking with you
11    and pondering the matter, I feel it is imperative
12    to remind you that as a professional you are to
13    adhere to the highest standards and ethics.
14              "Please be aware that if any such
15    comments or behaviors are made or exhibited in the
16    future, strong disciplinary actions will be taken
17    and the personnel office will be notified.
18              "In closing, I also remind you that I
19    deem you to be not only a very valued employee, but
20    also a friend.  So this memo is written out of deep
21    concern and anguish regarding this matter."
22              The second page signed by Mr. Howell on
23    10/12, is headed "addendum to memo dated 5/24/99."
24              "I was never given a copy of this memo.
25    I was never asked to review and sign it.  The first
```

```
 1   time I saw it was on September 25, 2000 following a
 2   hearing with Dr. Mayo.  This memo refers to no
 3   factual incident.  There is no basis whatsoever for
 4   this memo.  In substance, it is merely a rewriting
 5   of a memo dated 2/28/00.  The date of the memo was
 6   5/24/99, but it was stamped received April 13,
 7   2000.  I strongly suspect the document is a forgery
 8   and a blatant violation of contractual procedure.
 9   I fully intend to file a formal grievance pursuant
10   to this matter.  Mr. Russell has neither provided
11   me with the name of the guardian mentioned in this
12   memo, nor directed me to speak with this person.
13   No parent or guardian has ever contacted me about
14   any inappropriate statements that I have been
15   alleged to have made."
16        Q.   I'm going so to show you Plaintiff's
17   Exhibit 16 for identification.  Do you recognize
18   that document?
19        A.   Yes, I do.
20        Q.   When was the first time you saw that
21   document?
22        A.   Either a year or two years after I was
23   transferred.
24        Q.   That document then was not in the personnel
25   file that you reviewed on September 25, 2000?
```

1  A. That is correct.

2  Q. Do you recall the circumstances under which
3  you saw it?

4  A. It has an E5 up here, which is an exhibit.

5  Q. Would it be correct to say this was a
6  document that was eventually turned over to you in
7  connection with the union procedure?

8  A. That is correct.

9  Q. And you'd never seen it prior to that time?

10  A. That is correct.

11  Q. Does it bear the handwriting of Mr.
12  Russell?

13  A. Yes, it does.

14     MR. WILLIAMS: I'll offer it.

15     MS. KRAMER: No objection, your Honor.

16     THE COURT: Exhibit 16 is a full exhibit.

17     MR. WILLIAMS: May I read that please,
18  your Honor?

19     THE COURT: Yes.

20     MR. WILLIAMS: This document is a
21  memorandum to Clark Howell from John Russell.
22  Subject is curriculum, and the date is 4/4/00. Cc
23  to file, however, it is not stamped by the Board of
24  Education.

25     "Again, it has been brought to my

1  attention that you have not attended the math
2  department Monday curriculum meetings each month.
3  This written warning is to document the fact that
4  you have been admonished regarding this issue.  I
5  remind you that attendance at the Monday department
6  curriculum meeting is mandatory.  Any future
7  absences will result in further disciplinary
8  actions."
9      Q.   I'm going to show you now Exhibit 17 for
10 identification, ask you if you've seen that
11 document before?
12     A.   Yes.
13     Q.   When and under what circumstances?
14     A.   The first time I actually saw it was on
15 September 25th when we were going through my
16 personnel files.
17     Q.   And the second page of that document is the
18 response that you gave to Starlet Wilder?
19     A.   Yes.
20     Q.   Okay, under the same circumstances as the
21 previous ones you've testified about?
22     A.   Yes.
23          MR. WILLIAMS: It's offered, your Honor.
24          THE COURT: All right, and the defense
25 has the same objection to that.

```
 1              MS. KRAMER: Yes, your Honor.
 2              THE COURT: I'm going to give the same
 3    limiting instruction. This is again an attachment
 4    by Mr. Howell that was submitted in response to his
 5    file review, and it is not for the truth of the
 6    matter, but for the fact of having submitted that
 7    response. All right, with that limitation, it is
 8    an exhibit.
 9              MR. WILLIAMS: And may I read that, your
10    Honor?
11              THE COURT: Yes.
12              MR. WILLIAMS: This is a memorandum to
13    Clark Howell from John Russell. The subject is
14    concerns-outcomes. It is dated 4/7/00. It has a
15    file stamp from the Board of Education, although
16    the date of receipt is not legible, at least on the
17    copy that I'm holding. It says copy to
18    file-Starlet Wilder.
19              "This memo is sent to document the
20    outcomes of a number of serious concerns that I
21    have recently addressed with you. It appears that
22    there is an overall nonchalant attitude toward
23    attending required meetings which include your
24    regular curriculum meetings each month and building
25    level meetings. In addition, your timeliness to my
```