```
 1   requests requires immediate improvement.
 2           "In response to what I deem to be both
 3   cynical and sarcastic remarks, actions, and
 4   behaviors to other staff members, and in the
 5   presence of students, will not be tolerated.  I
 6   remind you that we are a concerned and caring
 7   institution of teaching and learning, and less than
 8   your best for students will not be accepted.
 9           "This memo will serve as a written
10   warning and placed in your personnel folder."
11           And the attachment signed by Mr. Howell
12   on 10/2/00.  It says "addendum to memo of 4/7/00."
13           "I was never given a copy of this memo.
14   I was never asked to review and sign it.  The first
15   time I saw it was on September 25, 2000 following a
16   hearing with Dr. Mayo.
17           "The wording is vague and unsupported by
18   facts.  Several examples are 'serious concerns I
19   have recently addressed with you,' which is vague.
20   'overall nonchalant attitude' is vague and
21   inaccurate.  'Timeliness to my request' is vague
22   and without basis.  'Cynical and sarcastic remarks'
23   is completely unfounded.  I have never made any
24   cynical or sarcastic remarks while at Hyde.
25           "I attend all required meetings.  The
```

1  time.' For the most part your oral expressions
2  were acceptable, and you were very clear and
3  precise with your questions, directions and
4  instructions.
5       "Assessment: Your consistent
6  monitoring, questioning and reinforcement were
7  effective methods of assessment.
8       "Summary of conference: It is evident
9  that you are most effective, especially with regard
10 to the scientific end of teaching because you have
11 mastered your subject knowledge and content."
12      And it is signed by Mr. Russell and Mr.
13 Howell.
14  Q.   Now, I'm going to show you Exhibit 19 for
15 identification, and I'd ask you when was the first
16 time -- strike that. Have you ever seen this
17 document before?
18  A.   Yes.
19  Q.   When was the first time you saw this
20 document?
21  A.   A year or so after. At that same -- this
22 is the same situation.
23  Q.   That's another -- I'm sorry, is that
24 another document that you saw for the first time in
25 connection the union meeting?

| | | |
|---|---|---|
| 1 | A. | Exactly. |
| 2 | Q. | After you had been transferred out of Hyde |
| 3 | and into Co-Op? | |
| 4 | A. | Yes. |
| 5 | Q. | Does it have Mr. Russell's signature on it? |
| 6 | A. | Yes, it does. |

7           MR. WILLIAMS: It's offered, your Honor.

8           MS. KRAMER: No objection, your Honor.

9           THE COURT: 19 is a full exhibit.

10          MR. WILLIAMS: May I read that, your

11  Honor?

12          THE COURT: Yes.

13          MR. WILLIAMS: This document is to Clark

14  Howell from John Russell. The subject is

15  collegiality. The date is 4/27/00. It is not file

16  stamped, but it has cc to file.

17          "It is imperative that collegiality

18  among the faculty be maintained to promote better

19  working conditions, improve teaching practices, and

20  to improve overall results. Outstanding teachers

21  are those who see beyond their own private

22  successes and failures and collaborate with others.

23  This staff is such a staff I believe, and there is

24  room for improvement.

25          "Specifically, I feel that you can help

```
1   to enhance the collegiality by being more
2   considerate, less sarcastic and condescending when
3   responding and communicating with other colleagues.
4   In certain instances, I'm aware this is a two-way
5   street and will continue to address this issue with
6   all staff when appropriate.
7              "Your attention and assistance in this
8   matter will be appreciated."
9       Q.   I'm going to show you now Plaintiff's
10  Exhibit 20 for identification.  Have you ever seen
11  that document before?
12      A.   Yes.
13      Q.   When was the first time you saw that
14  document?
15      A.   Same exact situation, after I was
16  transferred.
17      Q.   In connection with the union meeting?
18      A.   That is correct.
19      Q.   Is that Mr. Russell's signature on the
20  document?
21      A.   That is correct.
22              MR. WILLIAMS: It's offered, your Honor.
23              MS. KRAMER: No objection, your Honor.
24              THE COURT: Full exhibit.
25              MR. WILLIAMS: May I read that, your
```

```
 1   Honor.
 2              THE COURT:  Yes.
 3              MR. WILLIAMS:  This is a memorandum to
 4   Clark Howell from John Russell.  Subject:  Employee
 5   assistance program.  Date 5/2/00, but not file
 6   stamped.  Cc to file-Starlet Wilder.
 7              "Per our conversation on 5/1/00 herein
 8   in writing is the information that I would like you
 9   to have regarding the employee assistance program.
10   I'm hopeful that you will take advantage of this
11   program.  Again, the counselor's name is Ron Holmes
12   at 1-800-767-6171."
13        Q.   Mr. Howell, do you know who Ron Holmes is?
14        A.   No.
15        Q.   I'm going to show you Plaintiff's Exhibit
16   21 for identification.  Have you ever seen that
17   document before?
18        A.   Yes.
19        Q.   When was the first time you saw that
20   document?
21        A.   First time I saw it was September 25 when
22   we went through my employee files.
23        Q.   Signed by Mr. Russell?
24        A.   That is correct.
25        Q.   And the second page is the response which
```

1   you prepared and filed with Starlet Wilder?

2       A.  Yes.

3       Q.  As in the previous?

4           MR. WILLIAMS: Offered, your Honor.

5           MS. KRAMER: Objection.  I renew my

6   objection as to the second page.

7           THE COURT: All right, once again, the

8   second page is a response.  This one is not signed

9   or dated.  Is there a foundation for that?

10          MR. WILLIAMS: Yes, your Honor.  I think

11  I had laid the foundation.  I asked him, but I'll

12  ask him again if you'd like.

13          THE COURT: The date for his filing this

14  addendum.

15          MR. WILLIAMS: Right.

16      Q.  Let me hand you a copy, Clark.  Is that an

17  addendum that you prepared at the same time you

18  prepared the others?

19      A.  At the same time.

20      Q.  And filed with Starlet Wilder at the same

21  time?

22      A.  That is correct.

23          THE COURT: All right, with that, again,

24  that limitation applies to his reply, and with that

25  limitation, Plaintiff's 21 is in evidence.

```
 1            MR. WILLIAMS: May I read that, your
 2   Honor?
 3            THE COURT: Yes.
 4            MR. WILLIAMS: This is a memorandum to
 5   Clark Howell from John Russell. Subject: Physical
 6   confrontation. Date 5/8/00. Cc to file, and it's
 7   stamped received Board of Education May 12, 2000.
 8            "This short memo is to address the
 9   situation that occurred between you and another
10   student on Thursday April 27, 2000. While I
11   understand that in the heat of confrontations
12   emotions can run high on the part of any and/or all
13   of the parties involved, aggressive physical action
14   on the part of any staff member is not an option.
15   This memo serves as a written warning to that
16   effect." Cc to Mrs. Carolyn Hooks. Dr. Louis
17   Puglisi and Mrs. Starlet Wilder.
18            The attachment says "addendum to memo
19   dated 5/8/00."
20            "I was never asked to review and sign
21   this memo. The first time I received it was on
22   September 25, 2000 following a hearing with Dr.
23   Mayo.
24            "The memo refers to 'aggressive physical
25   action' taken during an incident with student Terry
```

1  Bowden.  I took no aggressive physical action.  I
2  touched Terry Bowden on his arm he yelled 'let go
3  of me.'  I let go of him.  Students Jimmy Townsend
4  and John McCoter are witnesses to this event.  No
5  aggressive physical action was taken.
6         "The memo includes a cc to Mrs. Carolyn
7  Hooks.  To my knowledge Mrs. Hooks spoke with Mr.
8  Russell about this incident prior to the filing of
9  this memo.  She has never been directed to, nor
10 attempted to speak directly with me, neither before
11 nor after the filing of this memo."
12     Q.   Mr. Howell, I want to ask you a question
13 that's been raised by your comments in all of the
14 written responses that we've gone through, which
15 has to do with the fact as you've stated, "I was
16 never asked to review and sign this memo."  Was
17 there a practice with regard to allowing staff
18 members or union members to review and sign
19 admonishments of that kind?
20     A.   Yes.  Before something is placed in your
21 file, you should be able to read and review it so
22 you can make a comment whether you agree or
23 disagree in writing.  I was aware that he was
24 talking about writing up sarcastic comments and
25 violent behavior because he said, "I'm going to

```
 1   write you up for violent behavior, I'm going to
 2   write you up for sarcastic comments," and we had
 3   discussions about that and whether I thought -- and
 4   he would read me rough drafts and he would wave
 5   them and say, "I've got this memo, I'm going to
 6   file it," but he didn't actually let me review the
 7   version, and the versions that I saw on the 25th
 8   were very different, or worded differently than I
 9   would have possibly even -- well, I guess my
10   objection is on there.
11        Q.   My question was simply, is it -- was it in
12   fact the practice that, you know, if you were a
13   tentured teacher in the New Haven public schools,
14   if your supervisor was going to give you a written
15   write up downtown, you were allowed to look at it,
16   you were expected to sign it and given an
17   opportunity to file a response if you wished?
18        A.   That is correct.
19        Q.   But that didn't happen in these cases?
20        A.   That is correct.
21        Q.   I'm going to show you Plaintiff's Exhibit
22   22 for identification.  Does your signature appear
23   on that document?
24        A.   Yes, it does.
25        Q.   And does Mr. Russell's signature appear on
```

the second page, and after me bringing it to Mr. Russell's attention that none of that had anything to do with what was observed, and that was an observation form, eventually he said, "Okay, I can see that. Have Alyssa change it." And he called Alyssa over, and I stood over Allysa's shoulder while she deleted whatever we agreed should come out.

Q. She was doing this on her computer?

A. Yes.

Q. What were the things that you were upset about that he agreed to delete?

A. The word was "your bizarre behaviors seemed to help the classroom environment." And "your collegiality is not a factor in your teaching." And at the very, very end, that was the part that I remember the most being upset about, was the very, very end, and it said, "It's apparent that you're a good teacher because you're scientifically good at math. However, your bizarre mannerisms sometimes may make the students nervous, and I have concerns about that."

And I was like, "What is that doing in this observation, John? I mean, not only is it false, but what's it doing here? It has no

1  is once again the same limiting instruction that it
2  is not offered for the truth of the matter that's
3  contained in the writing, but only the fact of it.
4  It's dated October 12, '00. All right then, with
5  that limiting instruction, Exhibit 24 is in
6  evidence.
7          MR. WILLIAMS: May I read it please, your
8  Honor?
9          THE COURT: Yes.
10         MR. WILLIAMS: This is a document that in
11 the upper left-hand corner has a stamp saying it
12 was received by the Board of Education on September
13 14, 2000. It is a memorandum to Clark Howell from
14 John N. Russell dated 8/30/00. Re: Written
15 warning. Cc: Lou Puglisi, Starlet Wilder, file.
16         "Your disparaging comments to the entire
17 school community today were most inappropriate and
18 certainly unprofessional. I'm referring
19 specifically to your statement, 'I also like to
20 spend time with Mr. Sagnella's wife.' To refer to
21 another staff member's wife in such a degrading
22 fashion is preposterous, especially in view of the
23 fact that we're a character first program.
24         "Your status here at Hyde in the past
25 year has been tenuous at best. A final written

```
 1   warning was placed in your file in June of this
 2   year.  In addition, you have been admonished
 3   several times previously for making inappropriate
 4   comments.  Each of these situations have been
 5   unpleasant, disruptive and distasteful.
 6           "While I'm wholly in favor of helping
 7   employees grow and improve in their positions, I
 8   think we must identify the time when such
 9   counseling and direction has failed, and begin to
10   pursue other alternatives.  Therefore, I am
11   requesting that you -- that your seriously consider
12   your options for the future in view of the fact
13   that your bizarre comments, actions and behaviors
14   have not ceased.
15           "In the meantime, any future conduct,
16   behavior or action on your part that are unbecoming
17   of a professional may warrant final disciplinary
18   actions.
19           "Your signature below denotes you have
20   read this memo and fully understand its
21   significance."
22           This is witnessed.  It's signed by Mr.
23   Russell, witnessed by A. Buckley, and in the
24   handwriting below it says, "Clark Howell did not
25   sign this written warning, objecting to second
```

paragraph, second sentence," which is the sentence that reads "a final written warning was placed in your file in June of this year."

The second page is an addendum to memo dated 8/30. "I have refused to sign this memo because it contains several erroneous statements and exaggerations. The statement referred to in the opening paragraph is taken out of context. The statement was made lightheartedly in reference to the fact that since I have no wife of my own, I cannot introduce myself to the school in the same manner Mr. Sagnella can. Mr. Sagnella's pronouncement at the school meeting that he enjoys spending time with wife immediately preceded my own statement and drew a loud chorus of oohs and ahhhs from the assembled group. Mr. Sagnella has indicated to me personally he carries no grudge about the statement.

"On September 12 I asked Mr. Russell, with building union student Ariana Buckley as a witness, if anyone had filed a complaint regarding this issue. Mr. Russell clearly and unequivocally stated no one had filed a complaint.

"The third paragraph of the memo refers to 'your bizarre comments, actions and behaviors.'

 1  I find the wording to be highly offensive and
 2  without merit. There is no basis to describe
 3  anything that I have ever done in my years of
 4  teaching at Hyde as 'bizarre.' I strongly object
 5  to this statement and request it be removed from my
 6  employee file immediately.
 7       "There is not a single incident anywhere
 8  in my history of teaching, at Hyde or anywhere
 9  else, of 'bizarre' or unprofessional behavior on my
10  part. There is no basis for me to agree to the
11  fourth paragraph of this memo, nor for me to sign
12  it." And it's signed by Mr. Howell 10/12/00.
13     Q.  I show you Exhibit 30 for identification.
14  Do you recognize your signature on this document?
15     A.  Yes, I do.
16     Q.  Is that a letter that you sent to Ms.
17  Wilder prior to your final meeting with
18  Superintendent Mayo?
19     A.  Yes.
20     Q.  And is it stamped into the Board of
21  Education a date prior to your final meeting with
22  Superintendent Mayo?
23     A.  I believe it's the same day, but before the
24  meeting.
25     Q.  All right.

1  Q. That's okay. The letter from Dr. Ostroff
2  was in fact furnished in October; is that correct?
3  A. Yes.
4  Q. But you were not returned to work right
5  away, were you?
6  A. No, sir.
7  Q. Do you know why -- strike that. Were you
8  told by anyone in the New Haven school system
9  administration what the reason was?
10 A. No, sir.
11 Q. All right. There finally came a time, did
12 there not, when you were ordered into a subsequent
13 meeting with Superintendent Mayo in November 2000?
14 A. Yes, I remember that.
15 Q. And that was the one President Lucan
16 testified about where, among other things, there
17 was a staring --
18         MS. KRAMER: Objection, your Honor.
19         THE COURT: It's leading. Please don't
20 lead.
21         MR. WILLIAMS: Very good.
22 Q. I wonder if you can relate for us, sir, to
23 the best of your recollection, what happened at the
24 meeting with Superintendent Mayo in November 2000?
25 A. Again, we were hoping to plead our case