# EXHIBIT C

```
 1                 UNITED STATES DISTRICT COURT

 2                   DISTRICT OF CONNECTICUT

 3

 4      *    *    *    *    *    *    *

 5   D. CLARK HOWELL                    *

 6                   Plaintiff,    * Case No 02cv736(JBA)

 7            VS.                       *

 8   NEW HAVEN BOARD OF EDUCATION *

 9                   Defendant     * NOVEMBER 29, 2004

10      *    *    *    *    *    *    *    *

11        TRANSCRIPT OF THE TESTIMONY OF ZELPHIA HUNTER,
      JOHN ACQUAVITA, PATRICIA LUCAN, SHANIQUA GARCIA,
12     SHANTEL GARCIA, MICHAEL NEAL, CHARLES NEAL,
      IBRAHIMA KOUROUMA, ABOUBACAR GASSAMA,   MICHAEL
13     MARTONE, JOHN CROTTY, STEVE JEFFERSON, MICHAEL
         CLAXTON, JOSEPH PULIT, LONNIE SHEALY,
14           KENARA FOSTER, KENNY FOSTER

15   B E F O R E:

16        THE HON. JANET BOND ARTERTON, U.S.D.J.

17

18   APPEARANCES:
          FOR THE PLAINTIFF:
19        WILLIAMS & PATTIS
          51 Elm Street
20        New Haven, CT.  06510
          BY: JOHN WILLIAMS, ESQ.
21
          FOR THE DEFENDANT:
22        CORPORATION COUNSEL
          157 Church Street
23        New Haven, CT 06510
          BY: AUDREY KRAMER, ESQ.
24                              Sharon Montini
                           Official Court Reporter
25
```

32

```
 1              MR. WILLIAMS: Thank you, your Honor.
 2   Your Honor, Ms. Hunter.
 3              THE COURT: All right, Ms. Hunter, if
 4   you'll kindly take the stand and remain standing, the
 5   oath will be administered to you.
 6              Z E L P H I A   H U N T E R,
 7   having first affirmed, was examined and testified as
 8   follows:
 9              THE WITNESS: My name is Zelphia Hunter.
10   The last name is spelled H-U-N-T-E-R.  Address is 19
11   Windham Street, West Haven, Connecticut.
12              THE COURT: You may proceed, Mr.
13   Williams.
14              MR. WILLIAMS: Thank you, your Honor
15   DIRECT EXAMINATION
16   BY MR. WILLIAMS:
17       Q.   Ms. Hunter, what was your relationship with
18   the Hyde School?
19       A.   I was the coordinator for the parent
20   education program.
21       Q.   What did your duties involve?
22       A.   I was like a liaison between the parents
23   and the school, and I trained parents to assist in
24   monthly meetings that we had with the parents, and
25   our focus was on character education.
```

33

```
1    Q.   When was it that you were the family
2  coordinator at Hyde School?
3    A.   I'm terrible with dates.  I would say like
4  1997 to maybe 2001.
5    Q.   All right.  During the time that you were
6  the family coordinator at Hyde School, during part
7  of that time was Clark Howell one of the teachers,
8  math teachers?
9    A.   Yes, he was.
10   Q.   And you know Clark sitting here at the
11  table?
12   A.   Yes, I do.
13   Q.   Were you also there at the time when Clark
14  was no longer a teacher there?
15   A.   Yes, I was.
16   Q.   Now, you know the principal there, Mr.
17  Russell, the gentleman sitting over here?
18   A.   Yes, I do.
19   Q.   During all of the time that Clark was at
20  Hyde School, were you able to form an opinion
21  concerning his abilities as a teacher at the
22  school?
23   A.   Yes, my daughter was in his classes.
24   Q.   And what was your opinion as a parent?
25        MS. KRAMER:  Objection, your Honor.
```

```
 1   statements that were made by Principal Russell
 2   about Clark Howell?
 3        A.   Yes, I did.
 4        Q.   What did he say?
 5        A.   On various occasions at staff meetings Mr.
 6   Howell's name would come up, and staff was advised
 7   to have nothing to do with him, and he alluded to
 8   the fact that he wasn't right and that he was
 9   crazy.
10        Q.   Mr. Russell said those things?
11        A.   Yes.
12        Q.   And was that on more than one occasion?
13        A.   Yes.
14        Q.   In your time as the family coordinator at
15   Hyde, had you ever had the experience of hearing
16   Mr. Russell make similar comments about another
17   person after she had been removed as a teacher?
18        A.   Yes.
19        Q.   And who was that?
20        A.   It was Jean Lovrin.
21        Q.   And did he say the same things about her
22   being crazy?
23        A.   Yes, similar.
24        Q.   All right.  And that was after she had been
25   removed?
```

```
 1      A.    Yes.
 2      Q.    What subject did she teach?
 3      A.    She was an art teacher.
 4            MR. WILLIAMS: I have no further
 5   questions.
 6            THE COURT: Cross-examination.
 7   CROSS-EXAMINATION
 8   BY MS. KRAMER:
 9      Q.    Ms. Hunter, did you ever observe Clark
10   Howell engaged in inappropriate conduct?
11      A.    I remember the staff meeting -- not staff
12   meeting, the meeting where he said something about
13   someone's wife, and at the end of it he said he was
14   just joking. I remember that.
15      Q.    Do you recall what he said?
16      A.    No.
17            MS. KRAMER: Thank you. I have no
18   further questions.
19            THE COURT: Redirect.
20            MR. WILLIAMS: I have no further
21   questions. Thank you.
22            THE COURT: Thank you, Ms. Hunter. You
23   may step down. You are excused.
24            MR. WILLIAMS: Mr. Acquavita.
25            THE COURT: All right, Mr. Acquavita,
```

```
 1  kindly take the stand and remain standing to be
 2  sworn.
 3              P A T R I C I A   L U C A N,
 4  having first affirmed, was examined and testified
 5  as follows:
 6              THE WITNESS: My name is Patricia Lucan,
 7  L-U-C-A-N, and I live at 29 Adla Drive in Hamden.
 8              THE COURT: You may proceed
 9  DIRECT EXAMINATION
10  BY MR. WILLIAMS:
11      Q.   Good morning.
12      A.   Excuse me, I have a cold.
13      Q.   Welcome to the club.  Ms. Lucan, you are
14  the president of the New Haven Federation of
15  Teachers; is that correct?
16      A.   Yes, sir.
17      Q.   How long have you held that position?
18      A.   This is the beginning of my fifth year.
19  Since 2000, June of 2000.
20      Q.   Once you became the president of the New
21  Haven Federation of Teachers, I suspect that may
22  have cut into your teaching work; is that right?
23      A.   Well, actually I'm relieved from teaching,
24  so it's a full-time position.
25      Q.   Before you took on that responsibility,
```

1  were you a teacher in the New Haven public schools?

2     A.   Yes, I was.

3     Q.   For how long?

4     A.   Well, I began teaching in 1969, took a nine-year leave in 1974 to raise three children, came back in 1983, taught until 2000, and now I'm here. I've been at it a long time.

8     Q.   Do your responsibilities as president of the New Haven Federation of Teachers include attending disciplinary meetings involving your members?

12    A.   Yes, absolutely.

13    Q.   Do you recall attending a meeting on September 25, 2000 at the Office of the Superintendent of Schools concerning Clark Howell?

16    A.   Yes, I do.

17    Q.   Who was present at that meeting?

18    A.   The attorney for the Federation of Teachers, James Ferguson; Mr. Russell; I believe Starlet Wilder, but I can't be absolutely sure at this point, she was the director of personnel; Clark, myself and Dr. Mayo.

23    Q.   Can you tell us what happened at that meeting?

25    A.   Yes. We went in and Mr. Russell spoke

| | |
|---|---|
| 1 | first, I believe, and then Dr. Mayo did most of the |
| 2 | talking.  He didn't really give Clark much of an |
| 3 | opportunity to say anything.  I believe my attorney |
| 4 | and I both kind of said that, you know, this would |
| 5 | be a proper thing, to have him say his piece and |
| 6 | what he -- what his side of the story was, and they |
| 7 | somewhat listened, but I think with closed ears, |
| 8 | and then Dr. Mayo made his decision, which I think |
| 9 | was made prior to us even starting, and that was |
| 10 | that he would have to give -- have a medical report |
| 11 | from a psychiatrist and that he more than likely |
| 12 | would not be going back to Hyde School, to which we |
| 13 | protested, but to no avail. |
| 14 | Q.   By not -- let me reword that.  By moving |
| 15 | the teacher from Hyde School to another school, if |
| 16 | that were to happen, would that have had an impact |
| 17 | on the teacher's pay? |
| 18 | A.   Tremendous impact, actually, because of the |
| 19 | difference in hours.  The stipend at this point in |
| 20 | time is $13,000 more a year, which is a significant |
| 21 | amount of money, and at that time it wasn't quite |
| 22 | that much, it was about ten or eleven, and we knew |
| 23 | that that would have a tremendous impact on his |
| 24 | ability to earn an income -- I mean, on his income. |
| 25 | Q.   I'm going to take a moment and pull out |

```
 1   some exhibits to show you.  I'm showing you Exhibit
 2   25 for identification.  Do you recall receiving a
 3   copy of this letter?
 4        A.   Yes.
 5        Q.   And that's a letter from Starlet Wilder; is
 6   that correct?
 7        A.   Yes.
 8        Q.   She was the --
 9        A.   Director of personnel.
10        Q.   Right.
11             MR. WILLIAMS: I'll offer that, your
12   Honor.
13             MS. KRAMER: No objection, your Honor.
14             THE COURT: Plaintiff's 25 is a full
15   exhibit.
16        Q.   And that is the letter which scheduled the
17   September 25th meeting; is that correct?
18        A.   Correct.
19        Q.   Showing you Exhibit 26 for identification,
20   do you recall receiving this letter?
21        A.   Yes.
22        Q.   And that's the letter from Dr. Eiker,
23   Clark's psychologist; is that correct?
24        A.   Yes.
25             MR. WILLIAMS: I'll offer that.
```

```
 1              MS. KRAMER: No objection, your Honor.
 2              THE COURT: 26 is a full exhibit.
 3              MR. WILLIAMS: Your Honor, may I read
 4    that one.
 5              THE COURT: You may.
 6              MR. WILLIAMS: Thank you.  This is a
 7    letter from Terry B. Eiker, Ph.D., of New Haven, to
 8    Ms. Lucan.  It says, "Dear Ms. Lucan," and it's
 9    dated September 29, 2000.  "This is to confirm that
10    Clark Howell is in treatment with me for major
11    depression which has remained in very stable
12    remission for some time.  We last met on September
13    26, 2000 and we are scheduled to meet again on
14    October 4th.  He's also seen by Robert Ostroff,
15    M.D., at the Spectrum Psychiatric Group.
16              "Mr. Howell is diligent about his
17    treatment with me and compliant with medication
18    prescribed by Dr. Ostroff.  Mr. Howell has
19    naturally been distressed by recent events at his
20    school, but he's keen to resume teaching, and I see
21    no reason at this time why he should not return to
22    work.  He intends to continue to see me and Dr.
23    Ostroff.  I hope this information is helpful".
24       Q.   Ms. Lucan, did you in fact provide that
25    letter to Superintendent Mayo?
```

1  A. Yes, I did.
2  Q. All right.
3  A. I believe that Dr. Eiker might have
4  provided it himself.
5      MS. KRAMER: Objection, your Honor.
6      THE COURT: Just answer questions.
7      THE WITNESS: Okay.
8  Q. And did Superintendent Mayo accept that
9  letter?
10 A. No, it was not sufficient. He wanted
11 something from a psychiatrist.
12 Q. Now I'm going to show you Exhibit 27 for
13 identification. Do you recall receiving a copy of
14 that letter?
15 A. Yes.
16 Q. And that's a letter from Superintendent
17 Mayo to Mr. Howell; is that correct?
18 A. Correct.
19     MR. WILLIAMS: I'll offer that, your
20 Honor.
21     MS. KRAMER: No objection, your Honor.
22     THE COURT: 27 is a full exhibit.
23     MR. WILLIAMS: Could I read that one as
24 well, your Honor?
25     THE COURT: You may.

1    MR. WILLIAMS: This is a letter dated
2    October 12, 2000 to Mr. Howell from Superintendent
3    Mayo. "Dear Mr. Howell: As you are aware, a
4    hearing was held on Monday, September 25, 2000
5    regarding your inappropriate behavior at Hyde
6    Leadership School. As a result of that hearing,
7    you were placed on administrative leave, with pay,
8    pending your production of a physician's
9    certificate that you are presently and emotionally
10   fit to return to work and can perform the duties of
11   your position.
12       "Let me be clear, your conduct and
13   especially your disparaging remarks were
14   unprofessional and wholly inappropriate in that it
15   caused some embarrassment and apprehension by the
16   staff at Hyde Leadership School.
17       "Upon your return, I expect you to
18   conduct yourself as a mature and professional
19   educator at all times. Any reoccurrence of the
20   aforementioned behavior may result in further
21   disciplinary action being taken against you
22   including suspension and/or termination.
23       "Should you have any questions, please
24   do not hesitate to call."
25   Q.   Now, I'll show you Exhibit 28 for

1  Q.  Showing you Exhibit 31 for identification, have you previously received a copy of that document?

4  A.  Yes.

5  Q.  And that's a letter of November 21st from Starlet Wilder?

THE COURT: Let me just make sure there is no objection to that.

MS. KRAMER: No objection.

MR. WILLIAMS: I'll offer it, your Honor.

THE COURT: Exhibit 31 is a full exhibit.

MR. WILLIAMS: May I read that as well, your Honor.

THE COURT: You may.

MR. WILLIAMS: This letter is dated November 21st, 2000 to Mr. Howell. "Dear Mr. Howell: A hearing was scheduled on Thursday, November 16, 2000 with Dr. Mayo, Superintendent of Schools, to return you from administrative leave and to discuss your new teaching assignment.

"In addition to assigning you to Cooperative Arts & Humanity High School, Mr. Mayo reiterated his concerns about your unprofessional actions and comments at Hyde Leadership School and his expectation this type of behavior never occurs

1  again.

2  "Be advised, Dr. Mayo has directed me to
3  convey to you that any recurrence of the
4  aforementioned behavior will not be tolerated and
5  without hesitation will result in a recommendation
6  to the Board of Education you be terminated from
7  your position as a math teach in the New Haven
8  public school system."

9  Q.  I'd like to ask you, Ms. Lucan, if you
10 could describe for us what happened at the meeting
11 on November 16 at Dr. Mayo's office.

12 A.  Okay, that meeting is very, very vivid in
13 my memory.  I was there with Clark, we had no
14 attorney with us that day; Dr. Mayo; Pamela
15 Barker-Jones, who was the supervisor of math at the
16 time; and Starlet Wilder, the director of
17 personnel.  I was a little bit shaky, it was my
18 first experience really with anything like this,
19 and Dr. Mayo can be a little bit intimidating.  We
20 went in basically to plead our case to keep Clark
21 at the Hyde School, trying to explain why Clark had
22 behaved the way he had, and that it was unfair to
23 move him out of that position.

24 Dr. Mayo actually started the meeting
25 and basically stated the same things that he had