```
 1   stated before.  Clark tried to interject, and he
 2   did it very politely, and Dr. Mayo, who was -- I
 3   was sitting here and he was sitting right here at
 4   the head of the table, with Clark over here, the
 5   other two ladies were across the table, a large
 6   conference table.  He shouted very loudly, "Man,
 7   are you interrupting me?"  And everybody kind of
 8   just went (indicating), you know, and Clark just
 9   stopped and tried to explain that, no, he wasn't
10   interrupting him, he was just trying to clarify
11   something, and at that point this staring match
12   started between Dr. Mayo and Clark, and it was
13   extremely uncomfortable, and Dr. Mayo just kept
14   staring and Clark kept staring back, and finally
15   Dr. Mayo said, "Are you trying to intimidate me?"
16           And Clark said, "No, you just told me
17   not to speak."
18           And that's when I jumped in.  I gathered
19   all my strength, because I was really kind of
20   shaking in my boots, and I said, "Excuse me," I
21   said, "but I think you are the one that is
22   intimidating my member, and I don't like it and I
23   want it to stop."  And basically I guess the
24   meeting was about over at that point.  The decision
25   was made, he was not going back to the Hyde School,
```

1   Mayo for his administrative leave and reassignment
2   to Co-Op.
3       A.   They were the two primary ones.  There was
4   also the comment from Mr. Russell that he had made
5   bizarre comments or was acting in a bizarre
6   fashion.  I remember the word "bizarre."  And so
7   based on whatever Mr. Russell was saying, which was
8   predominately those two incidents, plus bizarre
9   behavior, based on what I don't know, what Mr.
10  Russell had said was what -- what Dr. Mayo picked
11  up on, and based on that he saw fit that he could
12  not be at one of our schools, but for some reason
13  could be at another.  So, I never saw the sense in
14  that.  I had to get that in, I'm sorry.
15      Q.   But it did cost him 25 percent pay cut?
16      A.   It cost him, yes, a 25 percent pay cut not
17  only for that year, but for the onset of his career
18  now.
19      Q.   For the rest of his career?
20      A.   For the rest of his career, correct, which
21  is significant.
22      Q.   Is there a mandatory retirement age for New
23  Haven public school teachers?
24      A.   No.
25      Q.   So, they can teach as long as they like

1   once they get tenure?
2       A.   Yes.  Most teachers try to go 35 years
3   because that's what the state teacher's retirement
4   is for 70 percent of our pay.
5       Q.   And that 70 percent of pay, is that based
6   on the last X nothing of years of your --
7       A.   It's based on the three years prior, the
8   last three years' average salary.  So, it's a
9   significant amount of money, obviously.
10      Q.   And, therefore, if Clark Howell were in a
11  position that involved less pay than had he stayed
12  at Hyde, obviously that would be reflected even
13  into his retirement, correct?
14      A.   Yes, yes.
15      Q.   Nothing further.  Thank you very much.
16              THE COURT:  Any further recross?
17              MS. KRAMER:  No, your Honor.
18              THE COURT:  Thank you, Ms. Lucan.  You
19  may step down.  You are excused.
20              Would you kindly call your next witness.
21              MR. WILLIAMS:  Yes, your Honor, Shaniqua
22  Garcia.
23              THE COURT:  Ms. Garcia, kindly come to
24  the stand and remain standing.
25              S H A N I Q U A   G A R C I A,

```
 1   every single day, but maybe once a week to check in
 2   to see what was going on.
 3       Q.   Before that time, had it been your
 4   experience that he did that?
 5       A.   Are you asking me has Mr. Russell ever did
 6   that before?
 7       Q.   Right, that you'd seen?
 8       A.   No.
 9       Q.   Now, I want to ask about another teacher.
10   Did you ever complain to Mr. Russell about another
11   teacher cursing?  Without naming the teacher.
12       A.   Yes.
13       Q.   And that was some other teacher; is that
14   correct?
15       A.   Yeah, it was a staff member.  It wasn't a
16   teacher, it was a staff member.
17       Q.   And you complained to Mr. Russell about
18   that?
19       A.   Yes.
20       Q.   Did he do anything about it?
21       A.   We talked about the situation, but I felt
22   as though the situation really wasn't handled the
23   way I thought it should have been handled and I was
24   better off not saying anything at all because
25   nothing came of it.
```

1  A.  He was new to the game, so it was a
2  learning experience for him, but he didn't mind it.
3  That's how they did it, they always wanted a
4  teacher to work on a different program and get used
5  to the kids in a different atmosphere.
6  Q.  Okay. Was he a hard worker?
7  A.  Yes.
8  Q.  Worked good with the kids and with his
9  colleagues as far as you could see?
10 A.  Yes.
11 Q.  Anything negative about him, or was he a
12 positive guy to work with?
13 A.  He was positive most of the time. I didn't
14 have any problems with him.
15 Q.  Okay, great. Thank you very much.
16     THE COURT: Cross-examination.
17     MS. KRAMER: I have no questions, your
18 Honor.
19     THE COURT: Thank you, Mr. Claxton. You
20 may step down. You are excused.
21     MR. WILLIAMS: Mr. Pulit.
22     THE COURT: Mr. Pulit, please stand when
23 you come to the stand.
24          J O S E P H   P U L I T,
25 having first affirmed, was examined and testified

```
 1   as follows:
 2              THE WITNESS: Joseph J. Pulit, IV,
 3   P-U-L-I-T, I live at 40 Nicole Court in Cheshire,
 4   Connecticut
 5   DIRECT EXAMINATION
 6   BY MR. WILLIAMS:
 7       Q.   Sir, where are you employed at this time?
 8       A.   Waterbury Arts Magnet School.
 9       Q.   Was there a time when you worked in the New
10   Haven public schools?
11       A.   Yes, I worked from 1995 to last spring.
12       Q.   Okay.  And during that time, did you work
13   at the Hyde School?
14       A.   The whole time I was at Hyde.
15       Q.   What did you teach there?
16       A.   I taught history.
17       Q.   And did you have any responsibilities with
18   the New Haven Federation of Teachers?
19       A.   Yes, I was a union representative.
20       Q.   In that building?
21       A.   In that building.
22       Q.   Okay, in connection with those
23   responsibilities, was there a time in the fall of
24   the year 2000 when you were a witness to an
25   interaction between Mr. Russell and Clark Howell on
```

```
 1   the subject of a personnel file?
 2        A.    I wasn't a union rep at that time.
 3        Q.    Okay.
 4        A.    But I did witness a --
 5        Q.    What did you witness?
 6        A.    I was leaving the gym after there was a
 7   school meeting, we used to have the school meeting
 8   in the gym every morning, and as I was walking out,
 9   Mr. Howell asked Mr. Russell to see his personnel
10   file. Mr. Russell said no, or something to that
11   effect, because Mr. Howell responded back that he
12   had a right to see his personnel file, and at that
13   point Mr. Russell told him he needed to get his
14   union representative.
15        Q.    Okay, no further questions. Thank you,
16   sir.
17              THE COURT: Cross-examination.
18              MS. KRAMER: No questions, your Honor.
19              THE COURT: Mr. Pulit, thank you. You
20   may step down. You are excused.
21              MR. WILLIAMS: Mr. Shealy.
22              THE COURT: All right, Mr. Shealy, please
23   stand and you will be sworn.
24                  L O N N I E    S H E A L Y,
25   having first affirmed, was examined and testified
```

```
1    as follows:
2                THE WITNESS: Officer Lonnie Shealy,
3    S-H-E-A-L-Y, 1051 Cook Street, Waterbury,
4    Connecticut.
5                THE COURT: You may proceed.
6    DIRECT EXAMINATION
7    BY MR. WILLIAMS:
8         Q.   Where are you employed, sir?
9         A.   City of New Haven.
10        Q.   Okay, and what do you do for the city?
11        A.   I'm in security.
12        Q.   You are a security guard; is that correct?
13        A.   Yes.
14        Q.   And where do you work?
15        A.   Right now at Wilbur Cross High School.
16        Q.   How long have you been at Wilbur Cross?
17        A.   This is my first year.
18        Q.   Was there a period of time when you worked
19   security at the Hyde Leadership School?
20        A.   Yes, sir.
21        Q.   When was that, sir?
22        A.   From '98 to 2001.
23        Q.   During that period of time, did you know
24   Clark Howell when he was teaching there?
25        A.   Yes, I did.
```

1  Q. And were you able to make any observations about the kind of hours that Mr. Howell worked?

3  A. Hours that he worked?

4  Q. Right, that he was at the school I mean.

5  A. Basically any teacher that was out, I would let Mr. Russell know if a teacher was out.

7  Q. In other words, that was one of your responsibilities, if a teacher didn't show up, if you noticed it, you were supposed to report it to the principal?

11 A. That is correct.

12 Q. Do you remember ever reporting Mr. Howell?

13 A. Yes, sir.

14 Q. Okay, how many times?

15 A. I don't remember, sir.

16 Q. Were you present when Mr. Howell was required to remove his property from the building?

18 A. Yes, sir, I was.

19 Q. When did that happen?

20 A. I don't remember the date, sir.

21 Q. What do you remember observing about that?

22 A. Basically I was informed by my supervisor, Mr. Russell, that Mr. Clark needed to remove his stuff from the classroom and to leave the Hyde stuff, he needed to take his own personal stuff

1  that he brung in out.
2  Q.  And did you supervise that?
3  A.  Yes, sir, I did.
4  Q.  Under the orders from Mr. Russell?
5  A.  Yes, sir.
6  Q.  So that when Mr. Howell had to remove his
7  property from the building, it was under your
8  watch, under your watchful eye?
9  A.  Yes, sir.
10 Q.  How did he seem to be taking it?
11 A.  I guess he wasn't happy.
12 Q.  I have no further questions.  Thank you
13 very much.
14         THE COURT: Cross-examination.
15         MS. KRAMER: Yes, your Honor.
16 CROSS-EXAMINATION
17 BY MS. KRAMER:
18 Q.  Mr. Shealy, is that common procedure, that
19 you would watch when a teacher removed their
20 personal belongings from the school after being
21 terminated?
22 A.  Yes, ma'am.  That's students also, too.
23 Q.  And did you ever witness any inappropriate
24 conduct by Clark Howell?
25 A.  I have not seen it.  It was reported to me