1  just handed you on the topic of personnel files and
2  evaluations; is that right?
3      A.  Yes, sir.
4      Q.  Under the heading of evaluations, there is
5  a provision that all evaluations shall be given to
6  the teacher and the original to be signed by the
7  teacher; isn't that right?
8      A.  Yes, sir.
9      Q.  And that if the teacher doesn't sign it,
10 there is supposed to be a written indication that
11 the teacher had the opportunity to sign it; isn't
12 that right?
13     A.  Yes, sir.
14     Q.  And that unsatisfactory evaluation --
15 strike that question.  And it's also the case, if
16 you look at page -- at Section 81C, that before any
17 derogatory material is placed in a teacher's
18 personnel file, a copy must be sent to the teacher
19 and a meeting be arranged to discuss the contents
20 of such material and giving the teacher an
21 opportunity to discuss that material; isn't that
22 right?  Before any derogatory material is placed in
23 a teacher's personnel file, a copy will be sent to
24 the teacher and a meeting will be arranged if the
25 teacher wants it?

1  A. Yes.

2  Q. To discuss the contents of that material,
3  correct?

4  A. That's what it says, it's at the teacher's
5  request.

6  Q. All right, and it goes on to provide,
7  doesn't it, that no derogatory material which
8  concerns an incident occurring more than one month
9  previous to a file entry shall be put in a
10 teacher's file. Doesn't it say that?

11 A. Yes, it does.

12 Q. And you knew that in 1999 and you knew that
13 in 2000; isn't that right?

14 A. No, that's not correct.

15 Q. You didn't know it? You didn't read this
16 contract that governed your behavior as a
17 supervisor?

18 A. I think I may have scanned it, but I did
19 not specifically sit down and read these things.

20 Q. Well, sir, isn't it part of what the
21 taxpayers of the city of New Haven are paying you
22 to do, is to be familiar with the terms of the
23 contract that you administer?

24         MS. KRAMER: Objection; argumentative.

25         THE COURT: Would you rephrase your

1   question, Mr. Williams.

2           MR. WILLIAMS: Sure.

3       Q.  Isn't it part of your job to be familiar
4   with the contents of that document?

5       A.  Yes, it is.

6       Q.  And so are you saying you fell down on the
7   job?

8           MS. KRAMER: Objection, your Honor,
9   argumentative.

10          THE COURT: Overruled.

11      Q.  You fell down on the job, is that it?

12      A.  Yes, sir.

13      Q.  Then you would acknowledge that in fact
14  what you did here in causing some of these
15  documents, and particularly this one, the one you
16  are looking at right now, this item number 14, to
17  be placed in Clark's file on April 13th, 2000, was
18  a clear, direct violation of the terms of that
19  contract that you were supposed to uphold?  You
20  agree with that, don't you?

21          MS. KRAMER: Objection, relevance.  It's
22  not --

23          THE COURT: It's not what?

24          MS. KRAMER: It's not alleged, a
25  violation of the contract.

1  THE COURT: But this is
2  cross-examination. I'm going to permit this as
3  cross-examination. No, it's not an allegation of
4  the complaint.
5   A.  I had met with Clark regarding this memo.
6   Q.  If, in fact, as you claim, you caused this
7  document to be placed in his personnel file in
8  April of 2000 relating to an allegation that you
9  say you wrote up in May of '99, you agree that that
10 violated the contract, don't you, if that's what
11 happened?
12  A.  I don't know if I violated the contract. I
13 really don't know if I violated the contract.
14  Q.  I see. You have Exhibit 15, a copy of
15 Exhibit 15 there on the table in front of you,
16 don't you? Isn't it right on the top?
17  A.  Yes.
18  Q.  Exhibit 15 is a document that supposedly
19 concerns an incident on February 7, 2000, but is
20 dated on February 28, 2000; isn't that right?
21  A.  Yes, sir.
22  Q.  And somehow you didn't get that down to
23 headquarters and put in Mr. Howell's personnel file
24 until April 13, 2000; isn't that right?
25  A.  I don't know that that's true.

1   Q.  Well, what's the file stamp on the
2   right-hand side?
3   A.  I see it, but I'm very sorry to say many
4   times things go downtown and they don't receive it.
5   We're in Hamden.
6   Q.  So, you are going to put the blame on
7   Starlet Wilder on this one?
8   A.  No, I'm putting it on the mailing system.
9   Q.  U.S. mail?
10  A.  No, no.
11  Q.  Let's go back to --
12  A.  It does happen, but this was sent downtown.
13  I don't know when they received it or when they
14  found it in their files.
15  Q.  Kind of an interesting coincidence that the
16  two were file stamped on the same day, 14th and
17  15th?
18  A.  Yes.
19  Q.  I see.  That's also a contract violation,
20  isn't it?
21  A.  Well, I sent this one late.  I sent this
22  one, the first one you are speaking of.
23  Q.  How about the one on 15, it's file stamped
24  April 13, 2000.  That means that's the day it went
25  into the personnel file, right?

1    A.    I would think so, sir.

2    Q.    And that's a contract violation, isn't it?

3    A.    It probably is.

4    Q.    Furthermore, there is absolutely no indication in this document that this was shown to Clark or that he was given a chance to sign it or a chance to have a meeting with union representation to discuss it. There is no such indication, is there?

10   A.    No such indication.

11         MR. WILLIAMS: Your Honor, I'm going to offer Exhibit 40 for identification as a full exhibit at this time.

14         MS. KRAMER: Objection as to relevance, your Honor.

16         THE COURT: Mr. Williams, you've gone over the terms with the witness notwithstanding the fact that wasn't in evidence. It doesn't seem to me that that is going to add anything, and it's only a portion of the contract.

21         MR. WILLIAMS: Right, it's the portion that relates to this topic.

23         THE COURT: This is not a contract violation case.

25         MR. WILLIAMS: Okay.

1   THE COURT: So, I think that your
2 examination has covered the essence of what you
3 have in mind, so I'm going to sustain the
4 objection.
5   MR. WILLIAMS: That's fine, your Honor.
6   Q. I'll leave this on the table in front of
7 you, sir. Now, take a look at Exhibit 16. Exhibit
8 16 is a memo to Mr. Howell dated April 4, 2000, and
9 it does not have a file stamp on it, does it?
10   A. No, sir.
11   Q. And yet it says cc, and that means copy,
12 carbon copy I guess in the old time lingo, but it
13 means copy, correct?
14   A. Yes, it does.
15   Q. To file?
16   A. Yes, sir.
17   Q. So what file were you talking about?
18   A. The folder that's on my desk -- that was on
19 my desk at the time.
20   Q. So, you kept a file in your office?
21   A. I would prefer to say folder, but I said
22 file here, to make him aware that I had a copy of
23 it.
24   Q. The fact is that you were keeping a
25 building file on Mr. Howell; isn't that right?

1    A.    I don't refer to it as a building file on
2    Mr. Howell.
3    Q.    I don't want to get into a game of words
4    with you, sir.  You had a file folder?
5    A.    Yes.
6    Q.    On your desk?
7    A.    Yes, I did.
8    Q.    In which you acknowledge you kept written
9    documents about this employee of yours, this
10   contract employee of yours, Mr. Howell; isn't that
11   right?
12   A.    On my desk, with all the employees, I have
13   a file.
14   Q.    I see.
15   A.    A folder.
16   Q.    One for each?
17   A.    I had a folder for each, and when I had
18   discussions I would talk to them and make notes and
19   put it in there.
20   Q.    And that's what is called a building file;
21   isn't it, sir?
22   A.    I guess it is, sir.
23   Q.    Meaning a file in the building where you
24   worked?
25   A.    Yes.

```
 1      Q.   And that's why you used the word "file"
 2   when you put "cc to file"?
 3      A.   Yes.
 4      Q.   On Exhibit 16; isn't that right?
 5      A.   Probably so.
 6      Q.   And yet when Mr. Howell asked you to see
 7   his building file, you told him that it did not
 8   exist; isn't that right?
 9      A.   That's true.
10      Q.   You lied to him; didn't you?
11      A.   No, I did not.
12      Q.   Well, now you just told us, you admitted to
13   us here in this room under oath that you had a file
14   on him, and as a matter of fact, you had a file on
15   each and every one of these teachers in your
16   building that you kept in your office?
17      A.   Yes.
18      Q.   That you called a building file, and you
19   admit that that was true in 2000, right?
20      A.   Yes, sir.  In the beginning of 2000, yes.
21      Q.   And yet you denied to Mr. Howell that there
22   was any such thing?
23      A.   That's right, September of 2000.
24      Q.   I see.  Because you had shredded them all
25   before September?
```

```
 1    A.    I had gotten rid of all of them.
 2    Q.    Is that right?  Then where did this
 3  document come from, Exhibit 16?  It's not from the
 4  personnel file downtown because it's got no stamp.
 5  Where did you get it?
 6    A.    Those were the documents that I had at the
 7  building at that time.  I don't know where this
 8  came from now except you say it came from downtown,
 9  sir.
10    Q.    Sir, you and your attorney produced it at
11  the very proceeding where you testified under oath.
12    A.    I did have this.
13    Q.    On June 26, 2001.
14    A.    I did have this.
15    Q.    As of 2001; is that right?
16    A.    Yes.  I did not shred everything.
17    Q.    So, you did have it?
18    A.    I did have this, yes.  I wrote it.
19    Q.    Because you had the file, didn't you, in
20  2001?
21    A.    I don't know if I had a file, sir, at that
22  time.
23    Q.    Well, you admit now that you produced this,
24  among many other documents?
25    A.    Yes.
```

1  Q.  At a hearing in June of 2001; isn't that
2  right?
3  A.  Yes.
4  Q.  You got them out of the file in June of
5  2001; didn't you?
6  A.  I removed the file with Clark Howell's name
7  on it. When he called it a file, before it was
8  called a file, I removed that out of the office. I
9  sent everything downtown.
10 Q.  This isn't file stamped downtown?
11 A.  You told me that.
12 Q.  Well, you can see that it isn't. It's in
13 front of you.
14 A.  Yes, I do see it, sir, but I sent
15 everything downtown.
16 Q.  When?
17 A.  Sometime that summer.
18 Q.  Where is the documentation to prove that?
19 A.  I have none.
20 Q.  Do you remember testifying that you didn't
21 have a building file as of May of 2000?
22 A.  Somewhere around there, yes.
23 Q.  But --
24 A.  I remember testimony about it.
25 Q.  But you've now testified that it was in the

```
 1   summer of 2000?
 2       A.   I thought --
 3       Q.   That you abolished, as you say, the
 4   building file?
 5       A.   I don't recollect the exact date.  This is
 6   four years ago, so I don't remember the exact
 7   month, but I thought it was during the summer.
 8       Q.   Well, it was four years ago, but this is a
 9   case that's been in litigation most of that time,
10   hasn't it?  You've had to give it more than
11   ordinary attention since then?
12       A.   The only thing I know, sir, is I was
13   called in for a hearing back in -- I don't know
14   what year it was.  So, I don't know how long it's
15   been in litigation.  I was surprised it came up
16   again when Ms. Kramer called me.
17       Q.   I see.  Now, if you want to take a look at
18   Exhibit 17, that's another memo, and in that
19   instance -- and that's a memo dated April 7, 2000,
20   correct?
21       A.   Yes sir.
22       Q.   And one of the differences between that one
23   and the one dated April 4, 2000 is on the cc line,
24   the cc line, as we've discussed on Exhibit 16,
25   which is the April 4 memo, simply says "file."  The
```

1  one on the April 7 memo, which is Exhibit 17, after
2  the initials "cc" says "file-Starlet Wilder,"
3  correct?
4     A.   Yes, sir.
5     Q.   The distinction is that when it says just
6  "file," that means you are putting it in your
7  personnel file but not sending it downtown, and
8  when it says "file-Starlet Wilder," you are doing
9  both?
10          MS. KRAMER: Objection, your Honor,
11 relevance.  It's been called building file.
12          THE COURT: Overruled.
13    A.   Yes.
14    Q.   So, when it has "file-Starlet Wilder," it
15 means you kept two copies, one for yourself in your
16 building file and one goes downtown; is that right?
17    A.   Yes.
18    Q.   If you will look at Exhibit 15 again,
19 that's the memo of February 28th.  That also has
20 the designation after cc "file-Starlet Wilder,"
21 correct?
22    A.   Yes.
23    Q.   Is that right?
24    A.   Yes, it does say file -- yes.  Yes, it
25 does.

```
 1    Q.  That's the one in which you contend that it
 2  took approximately six weeks for it to get from
 3  your building on Circular Avenue down to
 4  headquarters down near the train station at Gateway
 5  Center, correct?
 6              MS. KRAMER: Objection.
 7              THE COURT: Basis?
 8              MS. KRAMER: Argument.
 9              THE COURT: Overruled.
10    A.  I don't know.  I don't know about the mail
11  system.
12    Q.  All right.
13    A.  In terms of that.
14    Q.  Now, on the memo of April 7, which is
15  Exhibit 17, you state that this is a written
16  warning, correct, your last line?
17    A.  Yes.
18    Q.  And that is, in terms of the rights of
19  tenured teachers, a significant statement, isn't
20  it?
21    A.  Yes, sir.
22    Q.  Because it means that they're on a road
23  that could lead to termination; isn't that right?
24    A.  I would suppose so.  Yes, it could.
25    Q.  And that's why you chose to use that
```

```
 1   language.  As a professional administrator you know
 2   that when you use language like that in a written
 3   memo to a subordinate who is a teacher, tenured
 4   teacher, there is magic in those words, they mean
 5   something, right?
 6       A.  I would hope so.
 7       Q.  Well, it's a question of contract; isn't
 8   that right?
 9       A.  I would hope it would mean something.
10       Q.  Well, it's a question of the contract?
11       A.  Yes, it is.
12       Q.  It's a statement of significance?
13       A.  Yes, sir.
14       Q.  And, in fact, it's a statement, the
15   significance of which is covered by the union
16   contract, right?
17       A.  Yes.
18       Q.  It is one of those documents in which the
19   employee has a right to have a meeting with a union
20   representative and a right to comment; isn't that
21   right?
22       A.  Yes.
23       Q.  But, in fact, this document was not given
24   to Mr. Howell at the time it was written, it was
25   just sent downtown; isn't that right?
```