1   Q. Now, that's obviously two weeks, which is
2   less than the six weeks we had in the last
3   document. Is it your contention that this was in
4   fact placed in the mail to Gateway Center?
5   A. It could have been, yes.
6   Q. But you don't know?
7   A. I would presume it was placed in the mail.
8   I don't know exactly when.
9   Q. In that document you state, any -- and this
10  is your -- the beginning of the last paragraph,
11  just above your signature, "Any future conduct,
12  behavior or actions on your part that are
13  unbecoming of a professional, may warrant final
14  disciplinary actions." Those are your words,
15  correct?
16  A. Yes, sir.
17  Q. "Final" meaning termination, correct?
18  A. No.
19  Q. Well, that's about as final as you can get,
20  isn't it?
21  A. Final disciplinary action as far as I'm
22  concerned.
23  Q. There is a continuum of disciplinary
24  actions available to supervisors depending on the
25  circumstances, right?

```
 1    A.    Yes, sir.
 2    Q.    And the final one is termination, isn't it?
 3    A.    Yes, sir.
 4    Q.    Not removal from a school, but termination
 5  from teaching in that system, correct?
 6    A.    Yes.
 7    Q.    That's the final disciplinary action, isn't
 8  it?
 9    A.    I would think so.
10    Q.    And that was the phrase you used in this
11  memo on August 30, 2000, isn't it?
12    A.    Yes.
13    Q.    And that is what led to this meeting, this
14  hearing, if you will, as some people have called
15  it, on the 25th of September, correct?
16    A.    That's part of the reason.
17    Q.    I see.  Take a look at Exhibit 19.  I
18  believe you have a copy of that in front of you.
19  Do you have that?
20    A.    I don't think so.  No, I don't.
21          THE COURT:  Mr. Williams, I think we're
22  going to take a morning recess.  Perhaps you can
23  find that document and put it on the witness stand
24  for when we return.  15-minute recess.
25          (Jury exited the courtroom.)
```

1  evaluations and notes and things like that.
2     Q.  I see.  It isn't the case, is it, that at
3  the time in 2001 when you testified that you did
4  not know the distinction between those two
5  designations and said, "It could be typographical,"
6  you were actually trying to cover-up the fact that
7  you had maintained those building files on your
8  teachers?  You weren't trying to do that, were you?
9        MS. KRAMER:  Objection, your Honor,
10 relevance.
11       THE COURT:  Overruled.
12    Q.  You weren't trying to cover anything up,
13 were you, when you said that?
14    A.  No.
15    Q.  You do admit testifying in 2001 with regard
16 to the distinction between "cc file" and "cc
17 file-Starlet Wilder," you were asked, "What is the
18 difference between the two?" And you testified, "I
19 don't know, it could be typographical."  Do you
20 remember saying that under oath?
21    A.  I don't remember, but I could have.
22    Q.  Directing your attention to page 146 of the
23 transcript at the bottom where I've put that little
24 yellow tab.
25    A.  Yes.

1    Q.   Do you see that?

2    A.   Yes, I do.

3    Q.   Do you agree that's what you said under

4  oath at that time in response to that question?

5    A.   Yes, I do.

6    Q.   All right. Showing you Exhibit 20.  Oh, you

7  had a copy of that already.  I'm going to take this

8  back then.

9    A.   Yes, sir.

10   Q.   We always worry about losing these things.

11 Exhibit 20 is your employee assistance program memo

12 of May the 2nd.  That one you designated

13 specifically as a copy to your file and a copy to

14 Starlet Wilder, didn't you?

15   A.   Yes, sir.

16   Q.   Is it your contention that the ones that

17 you designated for Starlet Wilder were the more

18 important ones?

19   A.   I would say so, yes.

20   Q.   And this one was more important than the

21 one of April 27th on the subject of collegiality?

22   A.   I don't know why one would be more

23 important than the other in this case.

24   Q.   Isn't it a fact, sir, that the reason you

25 sent that EAP -- a copy of that EAP memo downtown

1  to Starlet Wilder is because you were trying to
2  create a paper trail that Clark Howell had
3  psychiatric problems?
4      A.  No, sir.
5      Q.  Isn't it a fact when you talk about EAP in
6  the employment context you are talking about mental
7  health problems?
8      A.  No, sir.
9      Q.  I see.  You agree, do you not, that as
10 early as January of 2000 you said to Mr. Howell
11 that you did not know what effect the medication
12 may be having on him?
13     A.  I don't know if I said that or not to Mr.
14 Howell.  We've had discussions about his health and
15 his medication, and he's told me about his blood
16 count going up and down, and I don't know if I had
17 occasion to say that to him or not.
18         MR. WILLIAMS: Can we mark this for
19 identification, please.
20         THE CLERK: 46.
21         THE COURT: What number is that?
22         THE CLERK: 46.
23     Q.  Showing you Plaintiff's Exhibit 46 for
24 identification, do you recognize your signature on
25 this document, on page 12 of this document?

1   A. Yes, I see my signature.

2   Q. All right. And above your signature were
3   written the words that you've read the document
4   "and affirm," referring to the statements contained
5   in this document, "and affirm that they are true
6   and accurate to the best of my knowledge," correct?

7   A. To the best of my -- yes.

8   Q. And directing your attention to the bottom
9   of page two of that document, you stated, did you
10  not, "During a conversation in January 2000, Mr.
11  Russell did state that he did not know what effect
12  the medication may be having"?

13  A. That's very possible, yes. Yes.

14  Q. In any event, you signed a statement that
15  that was true, that you did say that?

16  A. Yes.

17  Q. All right.

18  A. Yes, I did sign the statement to the best
19  of my knowledge.

20      MR. WILLIAMS: Your Honor, I'm going to
21  ask that Defendant's Exhibit O for identification
22  be marked as a full exhibit at this time.

23      MS. KRAMER: No objection.

24      THE COURT: Defendant's O is a full
25  exhibit absent objection.

1  Q. I'm going to place Exhibit O in front of
2  you, sir. That is a memorandum that you sent to
3  Superintendent Mayo in July of 2000, isn't it?
4  A. Yes.
5  Q. And you dated that one July 13 and it got
6  down there the very next day on July 14, according
7  to the file stamp at the bottom; isn't that right?
8  A. Yes.
9  Q. The file stamp at the bottom of that
10 document is different, isn't it, from the file
11 stamps on the other documents that you sent to
12 headquarters about Mr. Howell?
13 A. Yes. Yes, it is.
14 Q. The other ones say received such and such a
15 date, "Board of Education," this one says received
16 and the date, "Superintendent of Schools." Mr.
17 Howell was never shown a copy of this document, was
18 he?
19 A. By me, no, sir.
20 Q. And yet this document concerned Mr. Howell
21 in a very intense way, didn't it?
22 A. I have no idea.
23 Q. Well, it concerned him. It concerned him,
24 and only him; isn't that right?
25 A. This document was about him; is what you

```
 1   are saying?
 2       Q.   Right.
 3       A.   Yes, yes, it was about Mr. Howell.
 4       Q.   It starts out by saying "This is the
 5   information which I was to forward to you in June
 6   regarding one of our math teachers, Clark Howell."
 7   What do you mean by the phrase "which I was to
 8   forward to you in June"?
 9       A.   That I should have -- that I planned to
10   forward some information to him in June.
11       Q.   The implication of that is that you had
12   been talking to Superintendent Mayo about Mr.
13   Howell previously?
14       A.   Yes.
15       Q.   And you had, hadn't you?
16       A.   Yes.
17       Q.   In fact, you had been talking to
18   Superintendent Mayo regularly about Mr. Howell
19   during the year 2000; isn't that right?
20       A.   That's not correct.
21       Q.   It's not.  Well, at least you agree you
22   were talking to him about Mr. Howell some time in
23   or before June, don't you?
24       A.   Yes, sir.
25       Q.   And you also agree, because it says right
```

```
 1   in here, that you'd also been talking to him in
 2   July about Mr. Howell. You say, "The latest
 3   incident is regarding grades that I discussed with
 4   you last Friday," correct?
 5       A.   Yes.
 6       Q.   And then you go on and you have a total of
 7   eight bullet points concerning Mr. Howell; is that
 8   right?
 9       A.   Yes, sir.
10       Q.   Did you attach to or submit with this July
11   13th memo the eight written documents that you
12   referred to in those eight bullet points?
13       A.   I don't recall. I don't recall. I don't
14   know if eight bullet points were -- or eight things
15   were submitted. I have no idea. I don't know.
16       Q.   When I say "bullet points," I'm talking
17   about those black dots.
18       A.   Yes.
19       Q.   That your computer puts in front of it, all
20   right? And you do say --
21       A.   I list these, yeah. What you see here is
22   what I listed.
23       Q.   And below that you say "Attached please
24   find copies of corresponding documentation." So
25   you obviously attached at least part of this?
```

```
 1  steps.
 2      Q.  I see.  You may or may not have?
 3      A.  I believe I did.
 4      Q.  I see.  Is Mr. Puglisi still with the Board
 5  of Education?
 6      A.  Not to my knowledge.
 7      Q.  Now, the first item that you have on this
 8  Exhibit O, in your list of transgressions, concerns
 9  "Inappropriate comments in a class about the sexual
10  conduct of two other students." And you testified
11  on direct examination by your attorney this morning
12  that the conduct of those two students involved --
13  had occurred on a school bus; is that right?
14      A.  I don't know if I testified to the fact
15  that it occurred on a school bus.
16      Q.  Did it?
17      A.  No, it did not occur on a school bus.
18      Q.  Where did it occur?
19          MS. KRAMER: Objection, your Honor,
20  relevance.
21          THE COURT: Overruled.  It was raised on
22  direct.
23      A.  It occurred in a van.
24      Q.  A school van, correct?
25      A.  Yes.
```

```
 1    Q.   A school van?
 2    A.   Yes.
 3    Q.   Owned and operated by the New Haven Board
 4  of Education?
 5    A.   Not at that time.
 6    Q.   Who did own and operate it?
 7    A.   It was given to us.
 8    Q.   By?
 9    A.   An outside donor.
10    Q.   Okay, and having been given to you, who was
11  the owner, Board of Education?
12    A.   I think the Board of Education eventually
13  became the owner.  He owned it because he was
14  involved with us at one point.
15    Q.   At the time this sexual conduct occurred on
16  that school van, it was on a school trip; isn't
17  that right?
18         MS. KRAMER: Objection, your Honor,
19  relevance.
20         THE COURT: The matter, the incident was
21  brought up on direct.  I'm going to let Mr.
22  Williams explore.
23    A.   It was a track event that they attended.
24  It wasn't a school event, it was a track event.
25    Q.   And the conduct of a sexual nature was such
```

1  that it obviously became the talk of the school,
2  correct?
3     A.  I disagree.
4     Q.  Well, it seems like people seemed to know
5  about it from your testimony; wouldn't you agree
6  with that?
7     A.  Some people did know about it.
8     Q.  And they knew about it because they heard
9  about it from other kids?
10    A.  I don't know that.
11    Q.  Well, one thing you do know is that there
12 was supposed to be a chaperone from the school on
13 that van; isn't that right?
14          MS. KRAMER: Objection, your Honor,
15 relevance.
16          THE COURT: Overruled.
17    A.  Yes, there was.  Yes.
18    Q.  There was a chaperone from the school on
19 that van; isn't that right?
20    A.  Yes.
21    Q.  When that sexual conduct between those
22 students took place; isn't that right?
23    A.  Yes.
24    Q.  And that chaperone was Mr. Sagnella, wasn't
25 it?

```
 1      A.    Yes, sir.
 2            MS. KRAMER: Objection, your Honor.
 3            THE COURT: Basis?
 4            MS. KRAMER: Relevance.
 5            THE COURT: I'm going to overrule your
 6   objection.
 7      Q.    And despite the fact that the sexual
 8   conduct itself took place on the van that Mr.
 9   Sagnella, your teacher, was supposed to be
10   supervising, when you found out about it, you did
11   not report that downtown, did you?
12      A.    I don't understand the question.
13      Q.    You didn't report downtown to
14   Superintendent Mayo the fact that one of your
15   teachers on duty was so lax in his chaperoning
16   activity that sexual conduct between two students
17   took place right under his nose on a school van in
18   full view of enough other students that it became
19   conversation in the school; you never reported
20   that, did you?
21      A.    No, I did not.
22      Q.    But you did report the fact that Clark
23   Howell allegedly mentioned it in the presence of
24   the very students who knew about it?  You did
25   report that, didn't you?
```

```
 1      A.   I don't know about the students that knew
 2   about it, sir.  I do know that he said it in front
 3   of students.
 4      Q.   Do you think that it's worse for Clark
 5   Howell to mention that something took place which
 6   the students already knew about, or that it's worse
 7   for Mr. Sagnella whose job it was to keep an eye on
 8   those kids to sit there and let it happen?  Which
 9   is worse?
10      A.   I can't answer your question.
11      Q.   I see.
12      A.   Because I don't know what students knew
13   about it.
14      Q.   Fine.  Now, sir, you testified that you
15   contacted Mr. Howell on the weekend before that
16   meeting on September 25th and told him not to come
17   back on Monday?
18      A.   I told him not to come in on Monday.
19      Q.   And you testified that that took place on
20   the telephone, I believe; is that right?
21      A.   Yes, sir.
22      Q.   You called him?
23      A.   Yes.
24      Q.   When did you call him?
25      A.   That Friday evening.  I believe it was
```

```
 1   Friday evening or Saturday evening.  I'm not sure
 2   of the exact date.
 3        Q.   There was a football game, school football
 4   game that Saturday afternoon; wasn't there?
 5        A.   Yes, I believe so.
 6        Q.   And you attended it; didn't you?
 7        A.   Yes, I did.
 8        Q.   And so did Mr. Howell; didn't he?
 9        A.   Yes, he did.
10        Q.   As a matter of fact, Mr. Howell was at that
11   football game doing the same things Mr. Howell
12   always did at Hyde football games, which was
13   keeping the stats, doing the markers and all the
14   rest of that stuff on the sidelines, correct?
15        A.   Yes, I believe so.
16        Q.   He seemed perfectly normal; didn't he?
17        A.   Pardon me?
18        Q.   He seemed perfectly normal, the same as
19   always; didn't he?
20        A.   I didn't observe him except to see him.  I
21   didn't observe his demeanor.
22        Q.   I see.  Weren't you interested?  Weren't
23   you concerned?
24        A.   About?
25        Q.   Well, you expressed these great concerns
```