1   Q.   So, it wasn't something you just let go?
2   A.   No.
3          MS. KRAMER: I have no further questions.
4          MR. WILLIAMS: No questions, your Honor.
5          THE COURT: All right, thank you, Mr.
6   Russell. You may step down. You are excused.
7          Would you please call your next witness.
8          MS. KRAMER: I call Dr. Reginald Mayo.
9          R E G I N A L D   M A Y O,
10  having first affirmed, was examined and testified
11  as follows:
12         THE WITNESS: Reginald Mayo.
13         THE CLERK: And your address?
14         THE WITNESS: 54 Meadow Street, New
15  Haven, 06519.
16         THE COURT: You may proceed
17  DIRECT EXAMINATION
18  BY MS. KRAMER:
19  Q.   Good morning, Dr. Mayo.
20  A.   Good morning.
21  Q.   Can you explain to the jury what your
22  position with the city of New Haven is?
23  A.   I'm the superintendent of New Haven public
24  schools.
25  Q.   And how long have you had that position?

```
 1      A.    That is correct.
 2      Q.    You didn't know anything about it at all?
 3      A.    Pardon me?
 4      Q.    You didn't know anything about it at all?
 5      A.    Absolutely nothing.
 6      Q.    Didn't know that he had been sent to EAP?
 7      A.    Absolutely not, until I think the memo that
 8   he outlined, something that he wasn't going, which
 9   was on the list of bullets.  That's all I can
10   recall, that it did have something on there where
11   he suggested he go to EAP, and he did not go.  That
12   was on the sheet with the bullets that I had asked
13   him to put together.
14      Q.    And what's EAP?
15      A.    Employee assistance program.  That's
16   something that we refer individuals that have
17   substance abuse problems, other kinds of problems
18   that they may need someone to counsel them through.
19      Q.    What kinds of problems are you talking
20   about; drug abuse problems, what else?
21      A.    Pardon me?
22      Q.    You mentioned drug abuse problems.  What
23   other reasons do you send people to EAP?
24      A.    People that need counseling.
25      Q.    You mean psychiatric?
```

```
 1      A.   That appear to be aggressive, agitated,
 2  whatever.  We send people there for counseling,
 3  yes, we do.
 4      Q.   People that have mental health issues in
 5  your opinion?
 6      A.   Some have mental health, yeah.
 7      Q.   Some have drug issues?
 8      A.   Sure.
 9      Q.   I see.  And that's what EAP is for in your
10  system?
11      A.   Yes.
12      Q.   You testified that the September 25th
13  meeting was set up as a "very informal conference"?
14      A.   Uh-huh (indicating affirmatively).
15      Q.   Is that right?
16      A.   Sure.
17      Q.   Showing you Exhibit 25.
18      A.   Yeah.
19      Q.   Do you recognize the signature of Starlet
20  Wilder on that document?
21      A.   Yes.
22      Q.   At that time who was Starlet Wilder?
23      A.   Pardon me?
24      Q.   Who was Starlet Wilder?  She was your
25  personnel director?
```

1  School."

2   A.   Yes.

3   Q.   And you went on to say that if he got a
4  physician's certificate, and if as a result he was
5  permitted to return, "Any recurrence of the
6  aforementioned behavior may result in further
7  disciplinary action being taken against you,
8  including suspension and/or termination."

9   A.   Yes.

10  Q.   I note that you said "Further disciplinary
11 action." That's because what was represented by
12 this letter of October 12th was itself discipline,
13 wasn't it?

14  A.   He was put on administrative leave at that
15 session, and if I may --

16  Q.   No.

17  A.   May I say something?

18  Q.   No, you may not. Your lawyer will ask you
19 the question if she thinks it's appropriate. The
20 phrase "further disciplinary action" means that
21 this letter itself was considered by you as
22 discipline; isn't that right?

23  A.   Yes.

24  Q.   All right. And that's why, although you
25 said that you were placing him on administrative

```
 1      A.   I thought I said yes.
 2      Q.   So, if he ever again in a private
 3   conversation said if something happens in the
 4   future I might react by killing myself, and you
 5   found out about it, you were going to fire him for
 6   that; is that correct, sir?  Yes or no?
 7      A.   Oh, yeah, I would be concerned.
 8      Q.   Yes or no?
 9      A.   I don't know.  Let me just say that --
10      Q.   You don't know?
11      A.   I don't know.
12      Q.   But so then you are backing off that aspect
13   of your list of three?
14      A.   It's on the list of three in totality, yes.
15      Q.   And now you've added to that list of three
16   saying "I also like spending time with Mr.
17   Sagnella's wife"?
18      A.   I'm saying I was concerned about that
19   statement, too.
20      Q.   So, if he ever again in public made a
21   comment like that, he was going to be fired?
22      A.   Yes.
23      Q.   Now, each of the three things that you've
24   listed here, would you agree constitute statements?
25      A.   When you say "constitute," what do you
```

```
 1  mean?
 2     Q.   Mean are statements, each of the three
 3  things you said to get him fired is a statement?
 4     A.   Yes.
 5     Q.   But in the letter you said "actions and
 6  comments" that can get him fired.  So what are the
 7  actions that you would have fired him for,
 8  according to your letter?
 9     A.   I mean, in essence -- I don't know.  This
10  is --
11     Q.   You don't know, fine.
12     A.   This is a letter --
13     Q.   If you don't know --
14     A.   It's a very strong letter saying --
15     Q.   Just a minute.  Wait.  Stop.
16     A.   Cut the nonsense out.
17     Q.   Stop.
18     A.   Cut the nonsense out.
19     Q.   You really have to answer my questions.  If
20  you don't know, just say "I don't know."
21     A.   I don't know.
22     Q.   But it's your letter?
23     A.   This is Starlet Wilder's letter.
24          THE COURT:  This is getting a little
25  repetitive.
```

1    A.    This is Starlet Wilder's letter.

2          THE COURT: Please, let's just stop and
3    have the next question.

4    Q.    In preparation for the September 25th
5    hearing, or as you would have had it very informal
6    conference, you spoke with Principal Russell,
7    didn't you?

8    A.    I may have talked to Principal Russell on
9    occasions. I can't recall whether I talked to him
10   in preparation for the 25th. I had relative to the
11   other incident that happened, so I would assume,
12   yes.

13   Q.    In your conversations with Principal
14   Russell in anticipation or preparation for the
15   September 25th event, the two of you agreed that he
16   would go to faculty members and solicit written
17   materials from them that could be used at that
18   hearing; isn't that right?

19   A.    I told him I thought it may be in the best
20   interest --

21   Q.    Sir, yes or no?

22   A.    I'm not sure how that conversation took
23   place about statements from staff who initiate that
24   or what, but I could very well see myself saying,
25   well, if someone is saying someone is going to kill

## CERTIFICATION OF SERVICE

On the date above stated, a copy hereof was mailed to Attorney Audrey C. Kramer, Assistant Corporation Counsel, 165 Church Street, New Haven, cT 06510.

JOHN R. WILLIAMS