## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

D. Clark Howell              :
                                :
v.                           :       No. 3:02cv736 (JBA)
                                :
New Haven Board of Education  :

**Ruling on Defendant's Motion for Judgment as a Matter of Law, Remittitur, or in the Alternative a New Trial [Doc. # 76]; and on Plaintiff's Motion for Award of Attorney Fees and Expenses [Doc. # 74]**

Plaintiff D. Clark Howell, a math teacher in the New Haven public school system, brought suit brought under the Americans With Disabilities Act ("ADA"), alleging that he was discriminated against on account of a perceived mental disability, ultimately resulting in his transfer from the Hyde Leadership School to a new teaching assignment at the Coop Arts and Humanities High School, with a resulting 25% reduction in his rate of pay. A jury trial was held from November 29 through December 7, 2004, and the jury returned a verdict in plaintiff's favor, awarding $40,000 in compensatory damages for economic loss, $200,000 in damages for emotional distress, and future economic damages of $10,000 per year until 2025. Defendant New Haven Board of Education now moves for judgment as a matter of law under Fed. R. Civ. P. 50, and for remittitur or, in the alternative, a new trial under Fed. R. Civ. P. 59.

1

## I.  Background

Plaintiff was diagnosed with Type II diabetes in 1997 and with depression in February of 1998, and testified that after he began experiencing a worsening of his depression, he spoke with Alan Grenet, the assistant principal at the Hyde School, about his symptoms, telling Grenet that he needed to increase his dosage of Zoloft, the medication he was taking for his depression, and make an appointment with his psychologist. See Transcript of Testimony of D. Clark Howell, Vol. I [Doc. # 88] at 195 ("I said [to Grenet], 'I see a psychologist and I'm going to go check that out, I think, but right now I don't know what's happening, Alan, because I wake up and I have — it's like I'm walking through a fog.'").  Howell testified that after this conversation with Grenet, he gradually noticed a change in the way he was treated by the principal of the Hyde School, John Russell.  See id. at 207-08 ("He was very supportive until the Alan Grenet conversation where I slowly realized it's completely the other way around.  Every single time there is an opportunity, he's coming at me like I'm doing something different, or 'bizarre' was his words, 'that's bizarre.'  And I'm going, 'It's the same thing I always did.'").

In April of 2000, Russell asked Howell if he wanted to take advantage of the "Employee Assistance Program," and told Howell that "you can tell me because Al Grenet already told me what you

said." Howell Tr. Vol. II [Doc. # 87] at 135.  Zelphia Hunter, a
program coordinator for the parent education program at the Hyde
School, testified that "[o]n various occasions at staff meetings
Mr. Howell's name would come up, and staff was advised to have
nothing to do with him, and [Russell] alluded to the fact that he
wasn't right and that he was crazy."  Transcript of Testimony of
Zelphia Hunter [Doc. # 94, Ex. C] at 35.

     At this time, several incidents occurred involving what
Russell characterized as improper conduct by Howell, and Russell
recorded these incidents in memos placed in Howell's personnel
file.  Although Howell acknowledged many of the incidents
transcribed in Russell's memos, he characterized them quite
differently.  For example, Howell admitted to touching the arm of
a student, but testified that he was shocked when Russell told
him "I'm thinking about writing you up for that, for being
violent."  Howell Tr. Vol I at 217.  Russell recorded the
incident in a memo as a physical confrontation.  Howell admitted
being loud and angry in a meeting regarding two special education
students, see Howell Tr. Vol. II. at 155-56, about which Russell
wrote a memo; and admitted to making a comment about a fellow
teacher's wife at a school assembly, see id. at 25-26.  Howell
testified that his comment about his colleague's wife was meant
to be a joke on himself, and that when he tried to explain to
Russell that there was a misunderstanding, Russell "kept on

saying, 'This is your problem, and ever since Al Grenet told me what you said, I can't trust where you are coming from, and I think you should explain to the whole school where you are coming from on this.'" Howell Tr. Vol. II at 40.[1]

In another incident, after Howell brought a box of cookies to a student who had won a raffle that week, while the student was in another teacher's class, Russell again confronted Howell about his "bizarre" behavior, and stated, "'Al Grenet told me about your problems with your medication and I'm just concerned. I'm doing this out of concern, but you are acting very bizarre. You never go into another teacher's room.'" Howell Tr. Vol. I [Doc. # 88] at 223.  Howell testified, however, that teachers went into each other's classrooms "all the time."  "It's something that happens.  You go in, you see a teacher.  The door is open, you know, we're all — I'll go in Mr. Aurora's room, Mr. Aurora will come to my room.  I don't do it very often, and that was part of the premise of the conversation is 'That's not like you,' but then it became 'That's not like you, that's bizarre, and you've been acting strange lately, and I know about your medication problems.'  That caught my attention." Id. at 224.

Howell disputed other accusations by Russell.  For example,

---

[1]Howell also admitted to "put[ting] [his] foot in [his] mouth" on some occasions and that some colleagues perceived some of his comments as sarcastic.  Howell Tr. Vol. II [Doc. # 87] at 169, 179.

Howell testified that he never made a comment of a sexual nature in front of students; instead, hearing students discuss an incident, he told them "That's enough about Jarel."  Howell Tr. Vol. II at 162-63.  Howell testified, moreover, that he had not seen the memos and was not allowed to review his personnel file until after his September 25, 2000 hearing with Superintendent Reginald Mayo, and that he believed several of the memoranda had been back dated.  See Howell Tr. Vol. II at 51, 53-61.  The teacher's union contract, however, required such memos to be prepared within one month of the incident, and required that copies of such negative memos be sent to the teacher before being placed in the personnel file, and an opportunity provided to the teacher to discuss the contents of the memos.  See Testimony of John Russell [Doc. # 94, Ex. F] at 69-70.  The union contract also did not permit the administration to place derogatory material in a teacher's personnel file more than one month after the incident.  See id.

     In September 2000, Howell received notice that a meeting was scheduled with Superintendent Reginald Mayo on September 25, 2000, and was advised of his right to have union representation present.  Russell and Mayo testified that after Howell was given notice of, and prior to, the September 25 hearing, they became concerned about comments they believed Howell made that he would kill himself if he was fired, and that his father wanted to kill

Russell.  See Transcript of Testimony of Reginald Mayo [Doc. #
86] at 126-27; Transcript of Testimony of John Russell [Doc. #
86] at 56-57; see also Howell Tr. Vol. II at 200, 205 (testifying
that when asked by fellow teacher what he would do if he was
fired, he stated "I don't know, I'd shoot myself," and "John
[Russell] is doing this stuff with the building file, he claims
he's got memos and then he shows me stuff and doesn't give it to
me, when I ask for copies of it he says that I can have it and
then I can't, and it's freaking me out.  I don't know what to do.
I don't know if I have tenure.  And I've been talking to the
union steward.  My dad wants to kill him.  I mean, he's
furious.").[2]  Howell was barred from the school prior to the
hearing.  See Russell Tr. at 57.  At the September 25 meeting,
Russell related the substance of what he had recorded in the
memos, and at the conclusion of the hearing, Mayo placed Howell
on administrative leave pending submission of a physician's
certification that Howell was emotionally fit to return to work.
Mayo Tr. at 141.  Howell testified that he was given virtually no
opportunity to speak at the hearing.  According to Dr. Mayo, his
decision to place Howell on administrative leave was based
primarily on Howell's suicidal and threatening remarks prior to
the hearing.  See Mayo Tr. at 124-29.  These reasons, however,

---

[2]Howell testified that his remark that his father wanted to
kill Russell was "just a statement, a figure of speech," not a
"literal" statement.  Howell Tr. at 206.

were not specifically identified in the letter from Mayo
memorializing his decision for placing Howell on administrative
leave. Id. at 151.

After an initial letter from Howell's treating psychologist
was rejected, on October 16, 2000, psychiatrist Robert Ostroff,
M.D., submitted a letter to the school system stating that Howell
was capable of performing his job. See Howell Tr. Vol. II at 105.
At a November 16, 2000 meeting with Mayo, Howell was informed
that he was being transferred to Coop Arts and Humanities High
School. Howell's rate of pay at the Coop School decreased
$10,500 from his salary at the Hyde Leadership School.

Howell testified that other teachers and employees were not
disciplined for behavior that Howell characterized as far worse
than his purported misconduct. For example, Howell testified
that the superintendent's representative used an obscenity at the
school's graduation ceremony. See Howell Tr. Vol. II at 30-36.
Shaniqua Garcia, a student at the Hyde School, testified that she
complained to Russell about another teacher cursing in front of
students, but "felt as though the situation really wasn't handled
the way I thought it should have been handled and I was better
off not saying anything at all because nothing came of it."
Transcript of Testimony of Shaniqua Garcia [Doc. #94, Ex. C] at
69. Howell further testified that Russell made inappropriate
comments to students. See Howell Tr. Vol. II at 33-40 (Russell

told a student who cursed in the hallway that "I think we're going to bring your mom into school and have you say to her what you said in the hallway.  And then we're going to have you do to your momma what you said in the hallway.").

There was also testimony that an art teacher at the Hyde School had not been allowed to return to the Hyde School after her first year of teaching, after Howell told Russell that she was taking medication for depression, and Russell told him, "who knows what the medication might be making her say."  Id. at 200; see also Hunter Tr. [Doc. # 94, Ex. C] at 35 (testifying about statements Russell made about the art teacher at staff meetings).

## II.  Motions for Judgment as a Matter of Law, New Trial, and Remittitur

### A.  Standard

Pursuant to Rule 50:

> If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under controlling law be maintained or defeated without a favorable finding on that issue.

Fed. R. Civ. P. 50.

In considering a motion for judgment as a matter of law under Rule 50, a court "must consider the evidence in the light most favorable to the non-movant, giving that party the benefit

8

of all reasonable, favorable inferences the jury might have drawn from the evidence. The trial court is not to consider the credibility of the witnesses or otherwise assess the weight of conflicting evidence, since that function is given to the jury. Only when no evidence exists to support the jury's verdict and the verdict it reached could have been based on nothing more than surmise and conjecture or where there is such overwhelming evidence in favor of the movant that reasonable and fair-minded jurors could not arrive at a verdict against the movant, may a trial court properly grant a motion to set aside a jury verdict." Jones v. Spentonbush-Red Star Co., 155 F.3d 587, 591 (2d Cir. 1998)(citations omitted).

Fed. R. Civ. P. 59 provides that a new trial may be granted "in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." As a general matter, "a motion for a new trial should be granted when, in the opinion of the district court, the jury has reached a seriously erroneous result or ... the verdict is a miscarriage of justice." DLC Management Corp. v. Town of Hyde Park, 163 F.3d 124, 133 (2d Cir. 1998)(citations and internal quotation marks omitted). The Rule 59 standard differs from the Rule 50 standard in two respects:

> Unlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the

jury's verdict. Moreover, a trial judge is free to weigh the
evidence himself, and need not view it in the light most
favorable to the verdict winner.  A court considering a Rule
59 motion for a new trial must bear in mind, however, that
the court should only grant such a motion when the jury's
verdict is 'egregious.'  Accordingly, a court should rarely
disturb a jury's evaluation of a witness's credibility.

Id. at 134.

### B.  Discussion

#### 1.  Sufficiency of the Evidence

Defendant argues that plaintiff's ADA claim fails as a
matter of law, because the evidence presented at trial did not
provide a reasonable basis for the jury to find that defendants
perceived Howell as unable to work in a broad class of jobs such
as teaching, as the Board reassigned Howell to teach at a
different school within its school system.  In particular,
defendant argues that the evidence at trial did not support
Howell's allegations, on which the Court relied on that summary
judgment stage, that Hyde principal John Russell falsely accused
him of misconduct.

On summary judgment, this Court concluded that:

While the fact that Howell was transferred to a teaching
position at another school is powerful evidence that the
Board of Education did not perceive Howell as disabled
within the meaning of the ADA, i.e. substantially limited
in his ability to perform a range of teaching jobs, it does not
dispose of Howell's claim. The transfer which resulted in a
salary diminution reflects the result of a deliberative
disciplinary process, in which Howell's misconduct, as
reported by Russell as a participating school official, was
considered.  Because plaintiff's evidence can demonstrate
that principal John Russell perceived him as mentally
disabled and, by Howell's account, falsely accused him of

bad conduct, to the extent Russell's accusations were the
product of his perception of Howell's disability, they may
be shown to have in effect tainted the disciplinary process
that resulted in Howell's transfer.  Viewed in the light
most favorable to plaintiff, there is evidence indicating
that Hyde School principal John Russell was aware and
concerned that Howell was taking medication for depression,
contemporaneously accused Howell of inappropriate behavior,
and believed that Howell should not be teaching or working
in a school setting. . . .  A reasonable jury might conclude
. . . that Russell perceived Howell as being unsuitable for
any teaching job because of mental instability, that is,
that he regarded Howell as disabled within the meaning of
the ADA and conveyed the results of his perception in the
negative personnel entries and to members of the
disciplinary committee.

Thus, the adverse employment action of his transfer from the
Hyde School to the Coop Arts and Humanities High School,
where Howell earns approximately $10,000 less than he did at
Hyde, permits a reasonable inference that the false
accusations against Howell resulted from Russell's
perception of Howell as mentally disabled, and that Russell
thus infected the proceedings leading to Howell's
involuntary transfer from the Hyde School, since as a
participant in the disciplinary process, Russell was in a
position to influence the outcome.  While this causal chain
is tenuous, the evidence provides more than a "metaphysical
doubt" as to the basis for Howell's transfer.  Matsushita
Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574,
586 (1986).  A jury may find that the transfer occurred
because Howell was regarded as disabled within the meaning
of the ADA, without necessity of imputing discriminatory
intent to all the school officials participating in the
process leading to the transfer and reduced salary.

Ruling on Motion for Summary Judgment [Doc. # 39] at 12-14.

While this was a close case on this element, and Howell's
trial testimony was somewhat weaker than his blanket assertion at
the summary judgment stage that Russell falsified information
about him, the jury reasonably could have credited Howell's
testimony that Russell and Mayo unjustifiably exaggerated his

11

conduct, and reprimanded him but not others engaged in similar or worse behavior, because of perceptions of Howell's disability. There was evidence that Russell and Mayo were aware of Howell's depression, that Russell expressed his concern about it and about Howell's medication on several occasions, and that Russell stated that did not "trust" Howell. While such evidence does not overwhelmingly favor plaintiff's claim of perceived disability, it is sufficient to conclude that the jury's inference that Russell and Mayo believed that Howell was emotionally unable to work in the teaching field was reasonable.

The jury was instructed that "a perception that Mr. Howell was unable to work in any kind of teaching position or in the educational field would constitute a belief that he was substantially limited in the major life activity of working. A belief by the defendant that Mr. Howell was limited only in his ability to teach at the Hyde School would not." Jury Instructions [Doc. # 67] at 20. But as this Court concluded on summary judgment, Howell's transfer to another teaching position need not mean that the defendant did not perceive Howell as disabled within the meaning of the ADA. Because Howell was suspended from all teaching duties after the September 25, 2000 hearing, his psychologist's letter was rejected, and there was a month-long period of inaction after a psychiatrist submitted a letter in support his reinstatement, plaintiff's argument, that

12

"the principal and the Superintendent already had made up their
minds that he was unfit to teach and . . . they resisted evidence
to the contrary until it became impossible to do so any longer,"
could reasonably be credited by the jury.  See Plaintiff's Brief
in Opposition to Defendant's Motion for Judgment as a Matter of
Law, Remittitur, or New Trial [Doc. # 94] at 13.

        Moreover, in light of the testimony that another teacher who
was taking medication for depression was not permitted to return
to the Hyde School, that other teachers were not disciplined for
behavior similar to plaintiff's, and that the memos placed in
Howell's personnel file were not provided to Howell and may not
have been prepared at the time of the incident in question, the
evidence at trial was sufficient for the jury to conclude that
the expressed reasons for Howell's placement on administrative
leave and subsequent transfer were pretextual, and that the
motivating factor for Howell's transfer was his perceived
disability, that is, that he should not be teaching with his
mental disability.  Accordingly, the Court concludes that
reasonable and fair-minded jurors could arrive at a verdict
against the defendant, and defendant's Rule 50 motion on this
basis is denied.  A new trial is also inappropriate, as however
close this case was, the jury's verdict cannot be deemed
"egregious," and this Court finds no basis to disturb the jury's
implicit credibility findings.

## 2.  Future Damages

The defendant next argues that the Court erred in submitting the issue of front pay damages to the jury, because it is a form of equitable relief, and because plaintiff failed to submit evidence as to his intentions for future employment.

The remedies available under the ADA are identical to those under Title VII.  <u>See</u> 42 U.S.C. § 12117(a); 42 U.S.C. § 1981a(a)(2) (providing that complaining party in an action for intentional discrimination under the ADA "may recover compensatory and punitive damages as allowed in subsection (b) of this section [which provides for front pay and compensation for nonpecuniary losses], in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964," 42 U.S.C. § 2000e-5(g) [which provides for back pay]).  Although defendant did not object to the damage instructions on grounds that pay is an equitable form of relief prior to the Court's issuance of the jury charge, it is clear that both front and back pay are equitable remedies left to the court, not the jury, and therefore plaintiff was not entitled to a jury verdict on these issues. <u>See</u> <u>Broadnax v. City of New Haven</u>, — F.3d —, 2005 WL 1684211 (2d Cir., July 20, 2005) ("Because a lost wages award—whether in the form of back pay or front pay—is an equitable remedy, a party is generally not entitled to a jury determination on the question.")(citing <u>Robinson v. Metro-North Commuter R.R.</u>, 267

F.3d 147, 157 (2d Cir. 2001) ("Because back pay and front pay have historically been recognized as equitable relief under Title VII, neither party was entitled to a jury trial. . . .").

Because defendant did not object to the jury's consideration of front or back pay as outside the scope of its authority, however, defendant may be viewed as having consented to the jury trial on these issues under Fed. R.Civ. P. 39(c). See Broadnax, 2005 WL 1684211, at *6 (holding that "when a party demands jury consideration of lost wages under Title VII and the party's opponent fails to object, Rule 39(c) permits the district court to submit the lost wages issue for a non-advisory jury determination."); Fed. R. Civ. P. 39(c) ("In all actions not triable of right by a jury the court upon motion or of its own initiative may try any issue with an advisory jury or, except in actions against the United States when a statute of the United States provides for trial without a jury, the court, with the consent of both parties, may order a trial with a jury whose verdict has the same effect as if trial by jury had been a matter of right.").

Nevertheless, because an award of front pay is an equitable remedy within the discretion of the trial court, and because plaintiff invited the Court to view the jury's verdict as advisory in his opposition to defendant's motion, as permitted by Fed. R. Civ. P. 39(c), the Court will itself decide the issue of

15

front pay.  It is unnecessary to set aside the jury's verdict, as defendant requests, because it is taken as an advisory verdict only, leaving the determination of whether to award equitable front pay damages, and if so, in what amount, to the Court.  See Dominic v. Consol. Edison Co. Of N.Y., 822 F.2d 1249, 1257-59 (2d Cir. 1987) (affirming the district court's issuance of a front pay award that was, in essence, a reduction of the jury's front pay award, reasoning "front pay is a matter for the exercise of the trial judge's equitable discretion").

The front pay which is supported by the evidence is $10,000 per year — the minimum differential between the Hyde School and Coop School teaching positions – for as long as it would take plaintiff to obtain comparable compensation.  Because the lower salary Howell received at the Coop School is a product of the longer school day at Hyde, which Howell testified he preferred, Howell's salary reasonably would continue to be at least $10,000 less than his expected salary at the Hyde School, for some period of time, and the back pay award alone would not adequately compensate him for his injury.  While the evidence supports a front pay award of $10,000 per year for some length of time, it does not support an award extending until the year 2025.

A front-pay award is a proper method for making a discharged employee whole when "the factfinder can reasonably predict that the plaintiff has no reasonable prospect of obtaining comparable

16

alternative employment." <u>Padilla v. Metro-North Commuter R.R.</u>, 92
F.3d 117, 125-26 (2d Cir. 1996) (citation omitted).  Plaintiff
has not sought reinstatement at Hyde.  The evidence of
plaintiff's job prospects was limited to testimony about job
offers Howell received around the time of his involuntary
transfer and his reasons for rejecting them.  At least one school
— the Wintergreen Magnet School — offered a comparable salary to
that which he received at Hyde.  While Howell's reasons for
turning down his offer from Wintergreen were sensible and well-
considered,[3] such that defendant failed to prove its affirmative
defense of failure to mitigate damages, there was no evidence
from which a reasonable factfinder could conclude that Howell
would never be able to find comparable employment to that at Hyde
within the next 21 years.

This case is thus distinguishable from <u>Tyler v. Bethlehem
Steel Corp</u>., 958 F.2d 1176, 1189 (2d Cir. 1992), in which the
Second Circuit approved a front pay award of $667,000 over a work
life estimated to be 17 years, finding the award "well-cabined by

---

[3]The trial evidence showed, for example, that Howell
seriously considered accepting an offer from the Wintergreen
Magnet School, a for-profit school run by Edison with pay
comparable to that at Hyde School, and turned it down only after
he visited the school and talked to several teachers he said
intended to leave. <u>See</u> Howell Tr. Vol. II at 208 ("I met 10
teachers, every single one said, 'No, I'm leaving.'  No contract
and everyone I met is leaving?  Alarm bells were going off big
time.  There was a lot to weigh, pros and cons.  When it all came
down to it, I didn't have any kind of comfort level that's where
I wanted to be.").

the expert testimony of expected income, possible future earnings from other employment, and expected worklife." Id. at 1189. Here, in contrast, there was no testimony about unavailability of teaching positions in the area with similar extended day schedules as Hyde that would allow Howell to collect a similar supplemental stipend, nor was there testimony about unavailability of comparable rates of pay in other school systems or private or charter schools.  Moreover, while there was evidence that most teachers teach for 35 years in order to collect the state teachers' pension, see Transcript of Testimony of Patricia Lucan [Doc. # 94, Ex. C] at 61, there was no testimony on how long Howell expected to teach, and whether he in fact intended to work until the year 2025 (when he would have reached age 65).

Given the "uncertainties which might surround a front pay award to a younger worker," Whittlesey v. Union Carbide Corp., 742 F.2d 724, 729 (2d Cir. 1984), there must be some evidence in the record to provide a reasoned basis for assessing 21 years of front pay.  Howell's evidence is clearly deficient in this regard.

The Court concludes that the maximum front pay award that could be supported by the record is $10,000 per year for five years.  Five years reflects the reasonable difficulties in the present and immediate future in locating a comparable teaching

position as evident from the trial testimony (salary at Hyde was greater than at other New Haven schools because of longer school day, and schools such as Wintergreen offered less job security). After that point, whether plaintiff's salary shortfall would continue becomes unduly speculative. Cf. Whittlesey, 742 F.2d at 729 (approving a front pay award for "the full period from trial until Whittlesey would reach age 70, when compulsory retirement could be imposed," because "[t]he time period was relatively short, approximately four years," and thus did not involve "uncertainties") (citation omitted).

As the parties agreed, the Court must discount the front pay award to present value. Assuming a discount rate of 2%, see Oliveri v. Delta S.S. Lines, Inc., 849 F.2d 742, 746 (2d Cir. 1988) ("considerable historical data [demonstrates] that the interest rate averages close to two percentage points above the inflation rate"), the present value of an award of $10,000 per year for five years is $47,134.60.

### 3. Emotional distress damages

Defendant also seeks a new trial or remittitur on grounds that the jury's award of $200,000 for emotional distress was excessive, as plaintiff presented no evidence regarding any emotional pain, suffering, inconvenience, loss of enjoyment of life and mental anguish caused by his transfer. A judgment cannot be upheld where the damages awarded are "so excessive that

19

it shocks the judicial conscience." <u>Phillips v. Bowen</u>, 278 F.3d
103, 111 (2d Cir. 2002).  In assessing whether an award is
excessive, it is appropriate to review "awards in other cases
involving similar injuries, bearing in mind that any given
judgment depends on a unique set of facts and circumstances."
<u>Scala v. Moore McCormack Lines, Inc.</u>, 985 F.2d 680, 684 (2d Cir.
1993) (citation and internal quotation marks omitted).

Here, the evidence on plaintiff's emotional distress was
based on his all-encompassing love for his job at the Hyde School
and his extreme distress at the prospect of losing his job, which
provided him emotional and economic moorings.  <u>See</u>, <u>e.g.</u>, Howell
Tr. Vol. II at 199-203 (relating conversation with fellow teacher
prior to September 25, 2000 meeting, when he believed he could
lose his job, in which he stated, "'If I'm not at Hyde, I lost my
family,'" before breaking down in tears).  While there was no
testimony about Howell's condition after his transfer to the Coop
School, he testified about the repercussions of the financial
impact of the transfer, especially on his hard won economic self-
sufficiency, and that he continued to take medication for
depression.  <u>See</u> <u>id</u>. at 118 ("[J]ust keeping up with paying the
bills for my medical copay, just paying for the picking up the
prescriptions of the Zoloft became extremely, extremely taxing,
and I remember going weeks where I would have to borrow money . .
.").  The testimony of plaintiff's difficulties from his

depression supported the inference that he was exceptionally vulnerable to his mistreatment, and his emotional susceptibility resulted in feelings of despair upon learning of the prospect of losing his job at the Hyde School, such as "I'll shoot myself."

District courts in this circuit considering "garden variety" emotional distress claims, in which "the evidence of metal suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury," Bick v. City of New York, No. 95cv8781 (KMW)(MHD), 1998 WL 190283, at *25 (S.D.N.Y. Apr. 21, 1998), have reduced the jury's award to $50,000 or less. See McGrory v. City of New York, No. 99cv4062 (FM), 2004 WL 2290898 at *14 (S.D.N.Y. Oct. 8, 2004) (collecting cases). For example, in Trivedi v. Cooper, No. 95cv2075 (DLC), 1996 WL 724743 at * 9 (S.D.N.Y. Dec. 17, 1996), the district court remitted the jury's compensatory damage award for emotional pain and suffering from $700,000 to $50,000, where plaintiff's testimony offered only conclusory testimony that he felt "like how a woman would feel if her child were lost," "insulted," "indignant," "unhappy," and "emotionally upset." See also Reiter v. MTA, 01cv2762 (JGK), 2003 WL 22271223, at * 9 (S.D.N.Y. Sept. 30, 2003) (remitting jury's award for emotional distress from $140,000 to $10,000 where the plaintiff's injury fell "in the low end of the spectrum of 'garden-variety' claims.

The plaintiff testified to feeling "stressed," "nervous," "on edge," and "clammy," but he also admitted that he never had trouble eating or sleeping and he never sought medical or psychological help."); Tanzini v. Marine Midland Bank, 978 F.Supp. 70, 79-80 (S.D.N.Y. 1997) (reducing compensatory damage award from $200,000 to $30,000 where "plaintiff presented no evidence detailing the duration or magnitude of his emotional injuries, nor any evidence of medical or psychological treatment.").

Howell's testimony about his ongoing depression and the extent to which his Hyde School position was an integral part of his identity makes his claim more than one of "garden variety" emotional distress, however.  Howell reasonably may be viewed as particularly vulnerable to the emotional injury resulting from his discriminatory mistreatment and transfer.  Courts have permitted damage awards of greater amounts in similar circumstances, in which plaintiff's testimony offers a reasoned basis for finding an ongoing emotional injury.  See McGrory, 2004 WL 2290898 at *14 (collecting cases "where the plaintiff's testimony has provided greater detail concerning the severity and duration of the emotional distress or the plaintiff has adduced expert testimony larger awards have been approved.").  For example, in Kuper v. Empire Blue Cross & Blue Shield, No. 99cv1190, 2003 WL 359462 (S.D.N.Y. Feb. 18, 2003), the court

upheld the jury's damage award of $62,500 for emotional distress where the plaintiff testified that "his multiple visits to the psychologist were due solely to his emotional distress over his discharge," and where the plaintiff "identified tangible physical symptoms, noted their extent, and described what he felt with far more specificity and realistic resonance." Id. at *16-17. See also Phillips, 278 F.3d at 111 (approving $400,000 emotional distress damage award where plaintiff "submitted evidence of ongoing harassment by each defendant over a five-year period," "testified in detail about her emotional distress, physical illness, and the effects of defendants' conduct on her lifestyle and relationships," and where co-workers "testified about the deterioration they observed in Phillips"); Koster v. Trans World Airlines, Inc., 181 F.3d 24, 35 (1st Cir. 1999) (in age discrimination case under state law, evidence that plaintiff's termination from long-held job to which he was devoted, which caused financial difficulties, trouble sleeping, and anxiety, "would support a maximum recovery of emotional damages of $250,000"); Rush v. Scott Specialty Gases, Inc., 930 F. Supp. 194, 199 (E.D. Pa. 1996) ($100,000 compensatory damage award based on Title VII plaintiff's emotional distress and depression).

While the jury's $200,000 award in this case is at the upper end of that reasonably supported by the trial evidence, it is not

so high that it "shocks the judicial conscience."  The emotional timbre of plaintiff's testimony made apparent the deep trauma and pain of his experience, and this testimony was sufficient to support the jury's verdict.[4]

### III.  Attorneys Fees

Under the ADA, a court may award "the prevailing party, other than the United States, reasonable attorneys' fees." 42 U.S.C. § 1988(b); 42 U.S.C. § 12205.  Indeed, a presumption exists that successful litigants in ADA cases "should ordinarily recover attorneys' fees ..." Raishevic v. Foster, 247 F.3d 337, 344 (2d Cir. 2001) (citing Kerr v. Quinn, 692 F.2d 875, 877 (2d Cir. 1982)).  Defendant cites 28 U.S.C. § 2412(d) as limiting recovery of attorneys fees to $125 per hour "unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee."  By its

---

[4]Defendant also seeks a reduction of the jury's damage award pursuant to the statutory cap imposed by 42 U.S.C. § 1981a(b)(3). As the statutory cap does not apply to front or back pay, see id. (limitation applies to "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses); Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, (2001) ("When § 1981a is read as a whole, the better interpretation is that front pay is not within the meaning of compensatory damages in § 1981a(b)(3), and thus front pay is excluded from the statutory cap."), and as the nonpecuniary losses totaled only $200,000, Section 1981a(b)(3) is inapplicable.

terms, however, 28 U.S.C. § 2412 governs cases in which the United States is a party and in which the prevailing party is other than the United States.  Its fee limitation therefore has no bearing on this case.

Instead, the attorneys' fees here must be calculated under the traditional lodestar method, "based upon the number of hours reasonably expended by counsel on the litigation multiplied by a reasonable hourly rate."  Luciano v. Olsten Corp., 109 F.3d 111, 115 (2d Cir. 1997) (citing Blanchard v. Bergeron, 489 U.S. 87, 94 (1989)).  "The 'lodestar' figure should be in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." Id. (citation and internal quotation marks omitted). The "prevailing community" used to determine the lodestar amount is the "the district in which the court sits." Id. (citation and internal quotation marks omitted). "[T]here is ... a strong presumption that the lodestar figure represents a reasonable fee." A.R. ex rel. R.V. v. New York City Dept. of Educ., 407 F.3d 65, 79 (2d Cir. 2005) (citations and internal quotation marks omitted).

Attorney Williams has submitted time records for 85.6 hours of work, billing at a rate of $350 per hour.  As this case proceeded through summary judgment and included a week-long trial, the number of hours billed is modest, and thus reasonable.

25

In support of his requested hourly rate of $350, Attorney Williams states that has been admitted to the Connecticut Bar and the Bar of this Court since 1968, specializing his practice in the area of civil rights, and has served as a Member of the Executive Committee of the Employment Law Section of the Association of Trial Lawyers of American, and as Chair of the Civil Rights Section of the Association of Trial Lawyers of America. Attorney Williams has not submitted any affidavits from or surveys of other attorneys practicing in this field concerning current prevailing hourly rates in the community. Instead, to establish that his rate is the prevailing market rate for similarly experienced counsel in this district, he relies on two cases from this district, Connecticut State Dep't of Social Services v. Thompson, 289 F. Supp. 2d 198 (D.Conn. 2003), which found that Center for Medicare Advocacy attorneys' hourly rate of $325 and a private attorney's $375/hour rate were reasonable given the complex Medicare class action on which they prevailed, and Bristol Technology, Inc. v. Microsoft Corp., 127 F. Supp. 2d 64 (D. Conn. 2000), in which the district court found in a complex antitrust case that "$375 is an appropriate rate for a trial lawyer with almost 30 years experience in complex civil litigation." Id. at 76. As neither of these cases involved employment litigation of the kind at issue here, they do not serve to establish the market rate for the Attorney Williams'

26

services in this case.  Although this case presented a less commonly litigated issue under the ADA, the legal, procedural, and factual issues were not distinctively complex or complicated.

Recent cases from this district have found hourly rates between $250 and $300 per hour to be reasonable for attorneys of similar experience as Mr. Williams.  See Fago v. City of Hartford, No. 3:02cv1189 (AHN), 2004 WL 1730351 (D. Conn. 2004) (in civil rights case, finding request for $300 per hour to be excessive, and awarding $275 per hour rate); Lamson v. Blumenthal, No. 3:00cv1274 (EBB), 2003 WL 23319516 (D. Conn., Oct. 23, 2003) (finding rate of $250 per hour to be reasonable "based on a comparison with other attorneys who practice in the field of employment litigation"); Sabir v. Jowett, 214 F. Supp. 2d 226, 251 (D. Conn. 2002) (concluding that "rate of $275 an hour is reasonable" for attorney's work in civil rights case); Tsombanidis v. City of West Haven, Connecticut, 208 F. Supp. 2d 263, 275 (D. Conn. 2002) (concluding that $275 per hour rate was reasonable for experienced civil rights litigator with 17 years experience); Omnipoint Communications, Inc. v. Planning and Zoning Comm'n of Town of Wallingford, 91 F. Supp. 2d 497, 499 (D. Conn. 2000) (in civil rights case finding partner rate of $300 per hour to be reasonable).

Absent any affidavits or other information establishing the currently prevailing rate in the community, but reflecting

27

Attorney Williams' extensive experience, the Court is left to conclude that $300 per hour is a reasonable hourly rate for this case.  Multiplying this rate by the 85.6 hours worked, the lodestar figure amounts to $25,680.

Defendant also objects to plaintiff's request for costs amounting to $3,363.25, on grounds that the requested $800.00 in witness fees and $1412.20 in Marshal's fees for service of subpoenas have not been itemized or documented.  Attorney Williams has affirmed the actual expenditure of these costs, and, as plaintiff called over 17 witnesses during the presentation of his case, the costs incurred are reasonable.

Accordingly, the Court concludes that plaintiff is entitled to an award of $29,043.35 in reasonable costs and attorneys' fees.

## IV.  Conclusion

For the foregoing reasons, defendant's motion for judgment as a matter of law [Doc. # 76] is DENIED.  Plaintiff's motion for attorneys' fees [Doc. # 74] is GRANTED with modification, and plaintiff is awarded $29,043.35 as reasonable attorneys fees and costs.  Lastly, the Court awards front pay damages in the amount of $47,134.60.  An Amended Judgment in the total amount of

$287,134.60,[5] plus attorneys fees and costs in the amount of $29,043.35, shall enter.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

**Dated at New Haven, Connecticut:  September 8, 2005.**

---

[5]The components of this judgment are: (1) the jury's award of compensatory damages for plaintiff's economic loss ($40,000.00), (2) the Court's award of front pay, discounted to present value ($47,134.60), and (3) the jury's award of compensatory damages for plaintiff's emotional distress ($200,000.00).